**SPERRY RAND CORPORATION, a Delaware corporation**

v.

**ELECTRONIC CONCEPTS, INCORPO-RATED, a Virginia corporation, John E. Zentmeyer, Jr., and Gus K. Tebell, Jr.**

Civ. A. No. 5241.

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 15, 1970.

Francis J. McNamara, Jr., John S. McGeeney, Ridgeway M. Hall, Stamford, Conn., Lewis T. Booker, Robert L. Dolbeare, Robert Brooks, Richmond, Va., for plaintiff.

George S. Leonard, Washington, D. C., Lloyd T. Smith, Jr., Tremblay & Colmer, Charlottesville, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This matter, tried before the Court without a jury, is an action in which the plaintiff seeks damages and injunctive relief. Jurisdiction of the Court is based upon diversity of citizenship of the parties, 28 U.S.C. § 1332. The amount in controversy exceeds the sum or value of ten thousand ($10,000.00) dollars, exclusive of interest and costs; and the Court finds diversity of citizenship exists between the plaintiff and each of the defendants.

In the interest of brevity, the plaintiff hereinafter will be referred to as "Sperry;" the corporate defendant, Electronic Concepts, Incorporated, as ECI; and the corporate defendant, Automatic Sprinkler Corporation of America, as "Automatic."

The plaintiff corporation is a Delaware corporation with its principal place of business in the State of New York and with a division of its corporation, which is engaged in design, development, manufacture and sale of electronic equipment, including radar, for military and commercial use, being located in Charlottesville, Virginia.

Defendants Zentmeyer and Tebell are residents and citizens of the State of Virginia; corporate defendant, ECI, was a Virginia corporation, organized in 1963, which was engaged in the design and manufacture of electronic equipment and up to the middle of 1966 made no radar or radar antennae, but ultimately became a competitor of Sperry in the field of military radar.

During the pendency of this suit, Automatic purchased the assets of ECI and assumed its liabilities, if any, by reason of this suit. ECI was thereafter dissolved, and its manufacturing operation, which was and is located in Charlottesville, Virginia, was designated as a division of Automatic Sprinkler Corporation of America, a corporation whose name was changed in October 1969 to A-T-O, Inc. Automatic was, by agreement, made a party defendant to this action.

The joint answers of defendants have been designated as affirmative defenses alleging, in effect, that this action is brought by plaintiff as a part of a policy to injure ECI in its trade and business. The Court finds no credible evidence in support of this allegation, which makes unnecessary any further reference to the designated affirmative defenses.

The gist of plaintiff's allegations is contained in a two count complaint in which, under Count 1, Sperry alleges that certain confidential information and materials, proprietary in character and in the nature of trade secrets, were improperly obtained and utilized by the

defendants for the benefit of ECI in its competition with Sperry. More specifically, under this count Sperry contends that, from October 1956 to the time of the institution of this suit, it, through the expenditure of large amounts of time, effort and money, developed certain items, manufacturing processes, techniques, data, etc., relating to the design, development, manufacture and sale of certain electronic equipment, and that the defendants (the individuals being former employees now employed by the corporate defendants) wrongfully acquired certain materials and information which were the trade secrets of Sperry and disclosed same to ECI, all to the damage of Sperry and to the wrongful gain of ECI. Count 2, while in the nature of a similar allegation, specifically charges defendants with conspiring to and wrongfully obtaining a certain trade secret in the nature of secret and confidential information pertaining to the contents of a bid for a contract to manufacture certain radar equipment. Plaintiff alleges further that said bid information was used by the defendants to its damage and to their wrongful gain.

In the interest of continuity, the Court will first address itself to the alleged confidential, proprietary information and materials in the nature of a trade secret, and defendants' alleged misconduct in connection therewith, as disclosed by the evidence received in support of plaintiff's allegations as contained in Count 1.

The matters in dispute under Count 1 have to do primarily with trade secrets concerning the design and manufacture of a slotted array type antenna for use in radar.

### Background

Sperry, at the time of the alleged misconduct as well as at the time of trial, maintained a division and plant in Charlottesville, Virginia, wherein each of the individual defendants was at one time or another employed. Zentmeyer, a graduate engineer, was employed by Sperry in 1959 as a junior engineer. Tebell, also a graduate engineer, worked for the plaintiff as a part-time engineering aide in 1958, and became a Sperry engineer in the early part of 1959, his primary function being in radar production as distinguished from design. Zentmeyer's work was primarily in design. Both individuals had graduated from the same engineering school, and each ultimately left Sperry's employ for employment with the defendant, ECI.

Radar is an electronic concept which has been in use for more than thirty years. Simply stated, a transmitter generates and broadcasts a microwave pulsed beam signal, which upon contact with objects in its path reflects signals back to the transmitter, which signals are received through the same equipment and usually amplified and displayed in visual form on a cathode ray tube, which enables the operator to determine the size, distance and movement of the objects detected.

Prior to 1960, Sperry and others in the marine radar field were primarily using parabolic reflector and pillbox type antennae. These antennae were bulky and evidenced operational difficulties. An attempt was commenced to reduce the weight of these bulky antennae, which weight was more than three times the weight of Sperry's ultimately produced slotted array antennae.

Zentmeyer, at the time he was employed by Sperry, did not possess any significant experience in the design, development or manufacture of radar equipment. About the time of Zentmeyer's employment, which was in January of 1959, Sperry began research into the development of a slotted array type antenna and Zentmeyer, along with others, performed the initial work and was primarily responsible for the Sperry slotted array program up until his departure from their employ.

A slotted array antenna consists of a precision-made hollow metal bar, known as the wave guide, with slots cut along its length through which microwave electronic energy is emitted. The energy is fed into one end of the waveguide

and is emitted through the slots in such a pattern that it is focused in a main beam, or lobe. The amount of power emitted by each slot in the waveguide is controlled by its angle of tilt, which in turn is geared to the amount of power remaining in the antenna at the point at which the slot is located along the length of the waveguide. The objective of the designer is to control the power distribution along the length of the antenna in such a way as to produce the desired beam characteristics. To achieve this objective, the arrangement of the slots, including their angle, spacing, width, depth and the tolerances within which they are machined are all critical.

In the initial development, in which Zentmeyer participated, an effort was made to generate formulae and mathematical approaches to the solution of the problems facing them. Much experimentation and trial and error was carried out in an effort to produce a successful array, including the cutting and testing of numbers of slotted arrays.

The performance of the antenna developed showed great improvement over any previous Sperry Marine antenna.

During 1961 and 1962, Zentmeyer continued to direct the development of the slotted array utilizing the Taylor Distribution Formula, a formula well known to engineers. The utilization of the Taylor Formula was made in conjunction with a computer program devised by Zentmeyer as an aid to his design effort.

In determining the angle at which each slot in a proposed slotted array antenna was to be cut, Zentmeyer utilized the Taylor Distribution Formula for the purpose of pro-rating the amount of radiation that takes place from each slot, to the end that the array would meet the side lobe requirements as might be specified. The center slots in an array radiate more strongly than the end slots, and since the power coupled out of the wave guide by the slot is a function of the angle, it was necessary for Zentmeyer, as an engineer, to select the distribution function first and then convert same to a slot angle. There are a number of distribution formulas utilized for this purpose, although generally that distribution which is ordinarily considered to be optimum in over-all is a general class of distributions known as the Taylor distributions, in which the Taylor distribution function gives one the amount of energy that he may wish radiated from each slot. It is then the engineer's function to convert the energy or power into an expression in terms of slot angles, and it is generally called the slot conductance. Conductance is essentially the measure of the relative amount of power taken from the wave guide by a particular slot. It then becomes necessary, in the design of a slotted array antenna, for an engineer to have an equation which relates conductance to slot angle. There are formulas containing unknown quantities which engineers use, as Zentmeyer did. Ascertaining the unknown quantities is generally accomplished by cutting and testing. One would, as Zentmeyer did, cut a number of test sections having different angles and in that way build up a library of conductance data.

The Court finds that in order to complete any such library it was necessary for Zentmeyer to go through much testing and experimentation, which he, in short, did, utilizing such materials as Sperry had in its library.

Under Zentmeyer's direction a successful slotted array antenna for a military radar known as AN/SPS–53 was developed.

From 1960 to 1964, Sperry was developing a series of commercial radar known as the Radar 5, the Radar 10 and the Mark III. When awarded a contract in 1963 for military radar known as the AN/SPS–53, Sperry utilized the knowledge and data accumulated in its commercial radar development. Zentmeyer was assigned the responsibility of developing a slotted array antenna to conform to Coast Guard specifications which set forth the performance standards expected of the array. Zentmeyer, in his efforts to design an antenna for

this purpose, utilized the work which he had previously done on slotted array antenna design and development. By the use of calculations, a computer program, the cutting and testing of sections, and the accumulation of data on the characteristics of the slots as heretofore referred to, a slotted array antenna, primarily by Zentmeyer's efforts, was ultimately produced by Sperry which not only met the required specifications but was unique and novel in its over-all performance. The manufacturing drawing which was ultimately produced in this connection was the culmination of Zentmeyer's efforts.

Zentmeyer felt his work had resulted in an array which he described as "simple, efficient and better performance than any known slotted array," and as a consequence in 1963 he filed an invention description sheet with the Sperry Patent Department. His enthusiasm for the results of his work was further described by him at that time as one that "Sperry's competitors are likely to use the idea if they learn the method of determining slot angles for proper phasing."

In the fall of 1963, Zentmeyer displayed to Dr. Saunders, a radar antenna expert, five antenna patterns which reflected his achievement of very low side lobe levels on a repeating basis.

In the development of a slotted array, the lack of a computer or computer program would make any such development a protracted and tedious chore to arrive at the necessary calculations.

The Sperry array, developed primarily by Zentmeyer while in Sperry's employ, was a valuable property that came about only after a great investment of time, effort and money. The techniques of producing a comparable array to Sperry's were not revealed in the literature on slotted arrays, and could only be determined through the accumulation of slot conductance data based on experimentation and trial and error. Even as late as 1969, data in the literature on slotted array antennae was considered poor.

An essential element of a successful antenna is the development of a design culminating in a manufacturing drawing which permits the machining of the wave guide between the precise values specified by theory and tolerances which allow machine shop production with a minimum of difficulty. The development of tolerances on the dimensions of Sperry's ultimate array required an unusual degree of experimentation.

A tolerance is basically a range within which an actual dimension can differ from the dimension called for on a blueprint or specification and still be acceptable. The objective which the engineer has in mind is to use the loosest possible tolerance which will still do the job. The tighter the tolerances, the more expensive it is to achieve, although sometimes very tight tolerances are necessary to produce the desired engineering results. On the slotted array antenna, it is critical to stay within the prescribed tolerances. There is an electronic relationship between the tolerances and the performance of the antenna. They affect such performance characteristics as side lobe levels, which are most sensitive to the holding of tolerances. The determination of what tolerances to prescribe is a cut and try process.

The tolerances determined by Zentmeyer, as set down in the manufacturing drawing, were of great value in the hands of any competitor. The tolerances were unusually tight and difficult, and a special tool had to be developed by Sperry's machine shop to meet them.

The slotted array developed by Sperry under Zentmeyer was of particular value to Sperry because it enabled it successfully to manufacture and sell the SPS–53 radar as well as its commercial counterpart, the Mark VI.

That the drawings and prints of the slotted array antenna were considered to be of a highly confidential and proprietary nature is understandable in view of the great deal of time, effort and expenditures made to develop same. That this trade secret of Sperry was of a highly confidential nature was transmit-

ted to all employees connected in any way with the slotted array antenna, and specifically was known to the defendants, Zentmeyer and Tebell.

At the time Zentmeyer and Tebell came into Sperry's employ each signed employment agreements providing that neither would divulge material, confidential to Sperry, to persons outside the company. Both fully understood their obligation in this regard.

Tebell was employed by Sperry as an engineer on August 25, 1958. Following the award of the first Coast Guard contract to Sperry in 1963, he, Tebell, was assigned the position of project engineer on the SPS–53 radar.

*Misappropriation by the individual defendants of confidential and proprietary information.*

■ The information developed by Sperry regarding the manufacture of the slotted array antenna was embodied in a manufacturing drawing introduced in this case as PX–38. That this drawing embodied a trade secret and was of great monetary value both to Sperry and to anyone who wished to compete with Sperry is well established by the evidence.

Referring specifically to Count 1 of the complaint and the misappropriation of the trade secret embodied in the manufacturing process, techniques and data relating to the design, development, manufacture and sale, PX–38 heretofore referred to embodied original data and contained all of the design information necessary to manufacture a slotted array antenna. This drawing was completed prior to Zentmeyer's departure from Sperry. Zentmeyer left the employ of Sperry on March 31, 1964, to become president of ECI. When he left Sperry he knew that ECI intended to compete with Sperry. At the time he left, or immediately prior thereto, with full knowledge that the Sperry slotted array antenna manufacturing drawing was considered by Sperry to be of a confidential nature he, unbeknownst to Sperry, took the Sperry slotted array antenna manu-

facturing drawing and, in addition thereto, he took much data which would be of use or value to a competitor which belonged to Sperry, including antenna patterns, lab reports, copies of pages of engineering laboratory notebooks, engineering sketches, blueprint drawings, engineering estimates of hours necessary to do certain work, and an antenna and pedestal drawing, a slotted array antenna which he had removed from Sperry during the summer of 1963 and which had been kept under lock and key by Sperry and which was ultimately used by ECI for purposes of attempting to impress the Coast Guard inspectors, as well as a copy of Sperry's technical proposal to the Coast Guard for the first SPS–53 contract awarded in 1963.

Zentmeyer, while admitting he removed the data heretofore referred to, argues that he received a clearance from his immediate supervisor for the removal of such data.

The Court finds that if, indeed, many of the articles which were introduced during the trial of this case were, in fact, in the cartons cleared by Zentmeyer's supervisor at the time Zentmeyer left Sperry's employ, that he, the supervisor, never intended to acquiesce to the removal of certain of the data. The Court finds that the supervisor, Stobie, did not check the items in the cartons individually, nor in view of Zentmeyer's professional standing would he be expected to make such a check.

This Court finds that Zentmeyer intended at the time of his cessation of work with Sperry to utilize confidential documents to the advantage of ECI and the detriment of Sperry.

■ The value to ECI of the information removed by Zentmeyer in connection with the slotted array antenna was that, when the Coast Guard in 1966 issued invitations for bids for the production of 99 radar sets, ECI, which at the time had no experimental slotted array and had neither cut nor tested a slotted array antenna or produced any antenna, was in a position by virtue of utilizing the property of Sperry to submit a bid

in competition with Sperry. The value to the corporate defendant of the materials and data specifically misappropriated by Zentmeyer, coupled with Tebell's actions in the conspiracy which the Court finds existed between them, in securing for ECI a manual which will be hereafter referred to, as well as securing from one Burford, a Sperry employee, the slot width dimension revisions as well as tolerances which had been changed since the time Zentmeyer and Tebell worked with Sperry, represented a monetary advantage, an unjust and immoral advantage, of $175,000.00, for the Court finds that the securing of the information utilized by the defendants, if prepared without access to the confidential documents of Sperry, would have been a protracted and tedious chore, particularly so for a small company without previous experience in the field. In short, the defendants appropriated Sperry's efforts and work-product which were considered novel and proprietary, and as a consequence were in a position to manufacture a slotted array antenna to Coast Guard specifications as required under the invitation for bidding, without the expenditure of research and development effort.

The Court finds that the corporate defendant's drawing of their suggested slotted array antenna, PX–91, was generated with direct reference to Sperry material.

*The Coast Guard's invitation for bids for 90 AN/SPS–53 radars made in the summer of 1966.*

During the summer of 1966, at a time when Tebell was still a Sperry employee, Zentmeyer and he met, and at Zentmeyer's request Tebell turned over to Zentmeyer for his use at ECI a copy of Sperry's technical manual for the SPS–53 radar. This manual contained detailed drawings and parts listed for the Sperry radar. It contained information not generally available to the public. It was understood by Tebell to be property of Sperry which they did not wish to be turned over to a competitor as same would give a competitor an advantage

over Sperry and would be helpful to anyone in preparing a bid, and specifically would be helpful to ECI for that purpose.

The Court finds that the individual defendants entered into a conspiracy in the summer of 1966 for ECI to secure certain proprietary and confidential information for use in a bid to be made by ECI in the procuring of a contract for the SPS–53 radars which the Coast Guard had invited.

The manual which Tebell turned over to Zentmeyer, the Court finds, was utilized, and intended by them to be utilized, to the end that ECI could maintain secrecy in connection with their intention to bid pursuant to the Coast Guard's invitation for bids for 90 SPS–53 radars. The manual that Tebell had turned over to ECI made it possible and was turned over for the purpose of ECI foregoing the need for viewing a similar manual at the Coast Guard facilities, the practice being that prospective bidders, while not permitted to copy the manual, were permitted to inspect same at the Coast Guard facility, but in connection therewith were required to sign a document which registered the names of· all who viewed the equipment which was kept there or the manual.

The Court finds that Sperry, who also bid on the contract, had been alert to the possibility of a small company, and in particular ECI, bidding on said contract, and except for the improper conspiratorial conduct on the part of the individual defendants, would have been forewarned that ECI was, in fact, considering the making of a bid. As a consequence thereof, Sperry was put in a position of not bidding lower than they ultimately did, which the Court finds they would have done had they known that ECI was going to bid or was in fact considering making a bid.

It was at the time of this invitation to bid in 1966 that ECI was unjustly enriched by virtue of having in their possession the materials and data misappropriated by Zentmeyer in reference to the slotted array antenna. Not only was

ECI enriched as a consequence, but the use of the materials directly damaged the plaintiff, for the use of those materials coupled with the Court's finding that Tebell, pursuant to the conspiracy existing between him and Zentmeyer, conveyed to Zentmeyer information regarding Sperry's proposed bid figure, making it possible for ECI to, as they did, submit a lower bid.

While much testimony was taken concerning the manner in which ECI prepared its bid and proposal to the Coast Guard, the Court finds that ECI could not have prepared the necessary proposal to the Coast Guard between the time in which they alleged they commenced to work thereon and the time the bid was made, had they not utilized the work product of Sperry, including information concerning Sperry's bid price.

The Court rejects as unworthy of belief the testimony of the individually named defendants as to the source of various dimensions required to prepare the ECI antenna drawings as well as their respective denials concerning their securing of information as to Sperry's bid price.

On the day the bids were submitted to the Coast Guard, that is September 6, 1966, ECI submitted a bid of $889,156, which was $6,420 lower than Sperry's bid of $895,576. It is interesting to note that, within a matter of hours prior to ECI is submitting its bid, its tentative bid was reduced by more than $350,000, which the Court finds was done for the purpose of underbidding a bid to be made by Sperry in an amount known to the defendant, Zentmeyer, by reason of a conspiracy existing between him and the defendant, Tebell.

The Court finds that this contract was the largest on which ECI had up until that time ever bid and, in addition, it was their first bid in connection with radar work. The preparation of ECI's bid was made over an unreasonably short period of time and what work was done on the preparation of the bid was done with the use of the Sperry manual heretofore referred to.

While the Court accepts as factual the testimony dealing with the conduct of the Executive Committee of ECI, to the end that they felt it important that ECI secure the bid, and while the Court finds no evidence to indicate that the Committee as a whole, or individual members thereof with the exception of Zentmeyer, knew of ECI's access to the confidential bid price of Sperry, the Court does not accept as factual the explanation of the preparation of the ECI bid as enunciated by the witnesses called by the defendants in connection therewith.

The Court finds that Sperry and ECI submitted the lowest bids to the Coast Guard, and had it not been for the misconduct of the defendants Sperry would have secured the contract, but by reason of the defendants' misconduct ECI was awarded the contract resulting in a substantial loss to Sperry, not only of the profits which would have been made thereon, but as a consequence of the loss of the contract Sperry was forced to discontinue its commercial Mark VI program, for it became economically unfeasible under the circumstances to continue the manufacturing of Mark VI radars for commercial use.

Shortly after the award of the contract by the Coast Guard to ECI Tebell left the employ of Sperry and commenced work with ECI.

The Court finds Zentmeyer's net worth to be in excess of $750,000, and while no specific figures were given in reference to the corporate defendant, the representations by all counsel lead the Court to the conclusion that the now corporate defendant is a company of much substance.

■ The Court finds that the loss to Sperry, taking into consideration the cost and expense incurred by them, as well as the loss of profits on spare parts and equipment sales which they would have received but for the defendants' misconduct, amounted to $231,012.00.

■ Sperry contends that in addition to the direct loss aforementioned they had projected a sale of 55 Mark VI com-

mercial radar sets per year over a period of five years, which would have represented a direct profit of $82,500 per year, plus a profit on spare parts in the amount of $9,231 per year. The Court finds this claim, however, to be of a speculative nature and, as a consequence, is not in a position to assess any damages in connection with the alleged loss.

The Court finds the conduct of the defendants to have been calculated, deliberate and of such a nature that it warrants the assessment of punitive damages as well as the assessment of reasonable attorneys' fees.

The Court finds that, while the conduct of the individually named defendants was reprehensible, the primary person upon whom responsibility should rest in connection with punitive damages is the defendant, Zentmeyer. The Court finds that it was his conduct which commenced the chain of circumstances leading to the ultimate damage.

■ It has been represented, and the Court accepts as factual, that the attorneys for the plaintiff have expended approximately 10,000 man-hours in the preparation of the trial of this case. The case was exceptionally well prepared and tried by all counsel. The diligence required in the preparation of the case is perhaps best exemplified by the fact that depositions of approximately 10,000 pages were taken. The lawyers on both sides are outstandingly qualified, and as a consequence thereof the matter was bitterly contested. The Court finds, therefore, that a reasonable sum by way of attorneys' fees to be assessed against the defendants is $225,000; that punitive damages against the defendant, Zentmeyer, and the corporate defendant, should be assessed in the amount of $175,000, and against the defendant, Tebell, in the sum of $10,000.

Based upon the foregoing findings of fact, the Court's legal conclusions are as follows:

■ The defendant, Zentmeyer, violated his duty of loyalty, fidelity and responsibility to his employer by removing documents and material of a confidential and secret nature from the plaintiff's plant and transmitting same to the corporate defendants and used by the corporate defendants to their unjust enrichment and damage to the plaintiff;

■ That the named defendants engaged in unfair competition with plaintiff by engaging in the conspiracy referred to in the Court's finding of fact;

■ That the defendant, Tebell, violated his duty of loyalty, fidelity and responsibility to his employer by making available to the defendant, Zentmeyer, individually and acting as President of Electronic Concepts, Incorporated, certain documents and material of plaintiff of a confidential and secret nature, and by conveying plaintiff's confidential bidding information;

Each of the individually named defendants breached their respective employment agreements with the plaintiff;

■ The acts of the defendants were willful and deliberate and were committed with the knowledge that they were unlawful and were calculated to result in substantial harm to the plaintiff. See Sperry Rand Corp. v. Rothlein, 241 F. Supp. 549 (D.Conn.1964);

■ The facts and circumstances of this case render it an appropriate one in which punitive damages should be assessed. Punitive damages have a twofold purpose: (1) to indemnify a plaintiff for the loss sustained, and (2) to prevent similar actions on the part of the responsible party and others in the future. See Stevens v. Abbott, Proctor and Paine, 288 F.Supp. 836 (E.D.Va. 1968); see also, Willis v. Miller, 29 F. 238, 244 (4th Cir. 1886);

■ While the general rule is that a prevailing party in an action is not entitled to counsel fees, Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), and while this rule is sup-

ported by overwhelming authority, there are exceptions not the least of which encompass those extraordinary cases involving oppressive, vexatious conduct, and those cases in which the federal courts have authority as a part of their historic equity jurisdiction to award counsel fees. See Local No. 149 v. American Brake Shoe Co., 298 F.2d 212 (4th Cir. 1962). In view of the finding by the Court of clear, cogent and convincing evidence of the oppressive and bad faith conduct of the defendants, and the individually named defendants having so blatantly violated their duty, fidelity and loyalty to the plaintiff, justice could not be served without the award of counsel fees;

■ The conduct of the individual defendants is imputed to the corporate defendant, ECI. The unauthorized use of confidential information was a violation of plaintiff's rights resulting in an unjust enrichment of the corporate defendant at the expense of the plaintiff, which equity will not permit to go unnoticed and for which the defendants are liable in damages. See Reynolds v. Whitin Mach. Works, 167 F.2d 78 (4th Cir. 1958); Servo Corp. of America v. General Electric Co., 337 F.2d 716 (4th Cir. 1964); cert. den. 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851, re-hear. den. 384 U.S. 914, 86 S.Ct. 1333, 16 L.Ed.2d 366; see also, Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855 (4th Cir. 1956);

■ While the data taken by Zentmeyer in connection with Sperry's slotted array antenna may have been an accumulation to some extent of information available and in use in the trade and as a consequence not patentable, novelty in the sense used in patent law is not a requirement of a trade secret. See A. O. Smith Corp. v. Petroleum Iron Works Co., 73 F.2d 531 (6th Cir. 1934);

■ The essence of a claim of the nature of this cause is the breach of confidence and breach of good faith as exhibited by the individually named defendants. The instant plaintiff is entitled to protection against such a breach of good faith and the reprehensible means utilized in the exploitation by the defendants of the plaintiff's confidential information and trade secrets. See W. R. Grace & Co. v. Hargadine, 392 F.2d 9 (6th Cir. 1968); see also, Reynolds v. Whitin Mach. Works, supra. Under the facts of the instant case, the moralities are completely with the plaintiff corporation. The plaintiff is entitled to its exclusive trade secrets until such time as competitors duplicate same by legitimate independent research, which the Court finds would have taken the defendants a period of two years. See Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163 (5th Cir. 1969);

The plaintiffs are entitled to actual damages, including the recovery of lost profits. See Reynolds v. Whitin Mach. Works, supra; International Industries, Inc. v. Warren Petroleum Corp., 248 F. 2d 696 (3d Cir. 1957);

Plaintiffs are entitled to an injunction against the defendants, and each of them acting individually or in concert with others in the manufacture or sale of a slotted array type antenna in connection with any radar device, for a period of two years from the date of this memorandum. The Court will reserve unto the defendants, in its equity jurisdiction, leave to apply to the Court for a modification of any such injunction in connection herewith to the end that innocent parties with whom they may have contracted will not be harmed. See Colgate-Palmolive Co. v. Carter Products, Inc., supra; W. R. Grace & Co. v. Hargadine, supra.

### Conclusion

Judgment for compensatory damages which include attorneys fees will be entered in favor of the plaintiff against the defendants in the sum of $631,012, and, in addition, judgment for punitive damages against the defendants Zentmeyer and ATO, Inc., as successors to Electronic Concepts, Inc., in the sum of $175,000, and against the defendant, Te-

bell, in the sum of $10,000, for a total judgment of $816,012.

In addition thereto, an injunction in accord with this memorandum will be entered.