496 P.2d 939

**Tony JOLLEY, Plaintiff-Respondent,**
**v.**
**PUREGRO COMPANY, a foreign corporation, Defendant-Appellant.**
**No. 10878.**

Supreme Court of Idaho.
May 4, 1972.

M. Allyn Dingel, Jr., of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for defendant-appellant.

Edward D. Ahrens, of Smith, McDonald & Ahrens, Nampa, for plaintiff-respondent.

BAKES, Justice.

This action and consequent appeal arose out of the conversion of a Lockwood Pota-

to Harvester and John Deere tractor axle extension owned by respondent Tony Jolley and converted by agents of appellant Puregro Company.

Respondent Jolley was a custom potato harvester, and used the Lockwood Harvester and the axle extension in conjunction with other equipment in his harvesting operation. At the end of the 1968 harvest season, respondent Jolley, not having a place to keep his equipment, stored the harvester and axle extension at Kenneth Johns' ranch, intending to use the equipment at the commencement of the 1969 harvest. Among the other farmers who also stored their equipment at the Johns place were the Smith brothers, whose equipment was mortgaged to appellant Puregro.

The conversion of respondent's equipment occurred during a formal foreclosure by appellant Puregro on the equipment belonging to the Smith brothers. Pursuant to court order for claim and delivery, and in the presence of Sheriffs Hileman and Barberis, Puregro's agents marshalled the mortgaged equipment of the Smith brothers at the Johns' place. Respondent Jolley's equipment was segregated from the Smith brothers' equipment. The record indicates and the district court found that Puregro's agents were explicitly advised by both sheriffs and Smith brothers not to take certain other equipment, including respondent's harvester and axle extension. In spite of the warnings and the segregation of respondent's equipment, Puregro's agents later took possession of respondent Jolley's equipment and transported it to Puregro's Mountain Home business location.[1] Pursuant to its claim and delivery action against Smith brothers, Puregro advertised Jolley's equipment and conducted an auction, selling the Smith brothers' equipment in which it had a security interest, and also selling respondent's harvester and axle extension for $25.00.

In October, 1969, upon returning from a summer's farming in Nevada, respondent Jolley discovered that his equipment was missing. Soon thereafter respondent Jolley discovered that appellant Puregro had taken it and demanded the return of the equipment. Puregro advised Jolley that his machinery had been sold. Respondent then attempted to purchase a new harvester to do custom harvesting that fall; however, his attempt was unsuccessful due to his apparent inability to secure the necessary credit to finance the purchase.

Respondent instituted this action for conversion and, in his complaint, prayed for damages for (1) the value of the converted equipment, (2) for lost profits from a 1969 harvesting contract he was unable to perform, and (3) for exemplary damages for appellant's alleged wanton, wilful and malicious act of converting the equipment.

Since appellant admitted the conversion of the equipment, the dispute in the district court centered primarily around the proper damages award. At the conclusion of the trial, the district court awarded $150 for the value of the converted equipment, $8,750 for profits lost by respondent's inability to perform the 1969 contracted harvesting (less $200 earnings of respondent in mitigation of those damages), and exemplary damages in the amount of $5,000. From those awards appellant has appealed, advancing twenty-four assignments of error.

From these assignments of error, three issues appear which are fundamental to the disposition of this appeal. Two issues concern damages—first, whether the award of lost profits was too speculative to be sustained; second, whether the circumstances of the conversion justified the award of exemplary damages. The third issue is a procedural one—whether the district court erred in concluding that respondent Jolley's wholly owned corporation, the Sweetwater

---

1. Apparently Puregro also took the equipment of other farmers, at least some of whom reclaimed their equipment from Puregro at their Mountain Home business location.

Cattle Company, was not a real party in interest and in determining that neither Sweetwater nor the Idaho State Bank was indispensable to the litigation. We will consider the procedural question first.

During the presentation of respondent Jolley's case in chief, evidence was adduced concerning the formation of the Sweetwater Cattle Company by respondent and his wife. The corporation[2] had forfeited its charter in 1968 for failure to file its annual statement and pay its license fees. Prior to forfeiting its charter, however, the corporation apparently obtained financing from the Idaho State Bank, purporting to give a security interest in certain pieces of farm machinery, including the converted harvester. When evidence of this transaction emerged in the course of the trial, Jolley moved to join the Sweetwater Cattle Company as a party plaintiff. Puregro objected on the ground that it did "not want additional parties brought in at this time, because it is the first time that we have been made aware of the situation with the corporation." However, the record shows that Puregro was aware of the security filing by Sweetwater Cattle Company to the Idaho State Bank on the piece of equipment in question prior to the time that Puregro filed its amended answer before the trial. However, the trial court sustained Puregro's objection and denied Jolley's motion to join Sweetwater Cattle Company as a party plaintiff.

Subsequently, when the plaintiff Jolley rested, Puregro moved to dismiss the action on several grounds, one of which was failure to join the Sweetwater Cattle Company as an indispensable party. In denying Puregro's motion, the district court ruled that based upon the record before it, it was clear that Jolley, and not the Sweetwater Cattle Company, had owned the equipment and therefore Sweetwater Cattle Company was not an indispensable party. The court further ruled that Puregro had waived its objection of failure to join Sweetwater as an indispensable party because it had prior knowledge of the security agreement given to the Idaho State Bank. Denial of appellant Puregro's motion is raised as error.

■■■■ The burden of proof in demonstrating the indispensability of a party rests on the moving party. Meyerding v. Villaume, 20 F.R.D. 151 (D.C.Minn.1957). There are several reasons why Puregro did not meet that burden. First, at the time of the trial the corporation, Sweetwater Cattle Company, had forfeited its charter and therefore the corporation could not be sued, nor could judgment be entered against it in its corporate name. Garrett v. Pilgrim Mines Co., 47 Idaho 595, 277 P. 567 (1929). It could not therefore properly have been a party. Secondly, Puregro's motion was based upon the record then before the court, i. e., plaintiff Jolley's case in chief. The court ruled, and from the evidence it was clear, that the corporation, Sweetwater Cattle Company, had no interest in the equipment because it had never been transferred by Jolley to the corporation. Those findings will not be disturbed on appeal since there was substantial and competent evidence to support them. Summers v. Martin, 77 Idaho 469, 478, 295 P.2d 265 (1956); Robinson v. White, 90 Idaho 548, 414 P.2d 666 (1966); Bratton v. Slininger, 93 Idaho 248, 460 P.2d 383 (1969). In view of those findings, Sweetwater Cattle Company would not have been an indispensable party to the litigation. Also, because the corporation had no interest in the property as found by the district court, it could not create a security interest in it in favor of the bank under the Uniform Commercial Code. *See* I.C. 28–9–105.

2. The corporate status is and always has been questionable. The respondent drew up the articles of incorporation without the aid of an attorney or other advisor; a third incorporator has disappeared from the scene, apparently "donating" his none- too-valuable share to respondent and his wife; no stock in the corporation was ever issued. In ruling on certain motions, *infra*, the district court implied that Sweetwater was not a corporation, either *de jure* or *de facto*.

Therefore, the bank would not have been an indispensable party.[3]

■■ As a further ground for denying the motion to dismiss, the district court stated that because Puregro had knowledge of the possible interest of Sweetwater Cattle Company but did not raise the defense of indispensable party in its amended answer, Puregro had waived the defense. Failure to join an indispensable party is a defense which cannot be waived under I.R.C.P. Rule 12(h) because the rights of persons who are not parties to the litigation are involved and may be affected by any judgment entered. However, as stated in Benger Laboratories, Ltd. v. R. K. Laros Co., 24 F.R.D. 450, 452 (E.D.Pa.1959), aff'd 317 F.2d 455 (3rd Cir. 1963), cert. denied 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed. 2d 64 (1963):

"[R]ule 12(h) cannot be interpreted to mean that a party with the necessary information to make a motion for joinder of an indispensable party at his disposal can sit back and raise it at any point in the proceedings, when the only effect of the motion under the circumstances would be to protect himself and not the person alleged to be indispensable."

This analysis is applicable to Puregro in the case at bar.

For the foregoing reasons, we think the trial court correctly denied the dismissal motions.

■ The next issue raised by the assignments of error relates to the award of $8,550.00 damages for loss of profits of a harvesting contract. Respondent attempted to recover lost profits from a harvesting contract which respondent, due to the conversion of his harvester, was unable to perform. Respondent testified that he expected to earn "around $20,000 gross" from the harvesting contract, and that of this

amount "approximately half" or $10,000 would ultimately have been realized as net income. Respondent also testified that in the previous year 1968, performing two harvesting jobs, his net income was "about ten or eleven thousand" dollars. Mr. Shaw, who had contracted with respondent for the harvesting of Shaw's potatoes in 1969, testified that he intended to pay respondent 25¢ per cwt (hundredweight) for the entire harvesting operation, that his yield in 1969 was 70,000 sacks, and that he expected to expend about $17,000 for the harvesting job. Based on this testimony, the district court awarded respondent $8,750 damages for lost profits, less $200 earnings in mitigation of those damages.[4] Since not even the cumulative effect of the above described testimony establishes lost profits with sufficient certainty to sustain the award, we conclude the district court erred in allowing respondent damages for lost profits.

It is well settled in Idaho law that in cases of "tortious interference with an established business that damages for loss of anticipated earnings or profits must be shown with reasonable certainty." McLean v. City of Spirit Lake, 91 Idaho 779, 783, 430 P.2d 670, 674 (1967). *Accord, e. g.,* McOmber v. Nuckols, 82 Idaho 280, 353 P.2d 398 (1960); Coast Transport, Inc. v. Stone, 79 Idaho 257, 313 P.2d 1073 (1957). The purpose of the "reasonable certainty" rule is to avoid making compensatory damages awards for lost profits which are fabricated or based on mere conjecture or speculation. *See, e. g.,* Harrington v. Hadden, 69 Idaho 22, 202 P.2d 236 (1949). In regard to whether lost profits are established with the requisite "reasonable certainty," this court has enunciated the rule that a mere estimate of net profit as a percentage of gross receipts, without evidence of overhead expenses or other costs of producing

3. Puregro's motion made no mention of failure to join the bank as an indispensable party, only Sweetwater Cattle Company.

4. The district court apparently accepted Shaw's testimony as to the gross worth

of the contract, i. e., 70,000 sacks times 25¢/sack for a total gross of $17,500. The court then utilized respondent's testimony that he netted "approximately half" of his gross, setting the lost profits figure at $8,750.

income, is too uncertain to sustain an award for lost profits. Coast Transport v. Stone, *supra*. *See* McOmber v. Nuckols, *supra*; Williams v. Bone, 74 Idaho 185, 259 P.2d 810 (1953); Nelson v. Oversmith, 69 Idaho 1, 201 P.2d 747 (1949). Weighing the evidence adduced by respondent Jolley on the issue of lost profits in light of the above enumerated rules, it is our opinion that the award of $8,750 for lost profits is too speculative. We have no quarrel with the sufficiency of the evidence establishing the gross receipts figure. There is competent specific testimony concerning the contract price and the yield of Shaw's potato crop to support a finding that respondent would have grossed in excess of $17,000 from the contract. However, the record is almost wholly devoid of evidence to substantiate his estimate that net profit would have been 50% of gross. Respondent's estimate is only negligibly bolstered by his testimony that his net income in 1968 approximated "ten or eleven thousand" dollars, since the record shows that the two periods, 1968 and 1969, were not comparable. In 1968 respondent used a borrowed Thomas "combine harvester" for part of his harvesting operation rather than the converted Lockwood which he intended to use in 1969. The Thomas Harvester performs the entire harvesting operation in one step, with the exception of hauling the potatoes from the field. The Lockwood harvester, on the other hand, only picks up already-dug potatoes from the ground. Thus, the harvesting operation in 1969 would have required the employment of other equipment to dig and vine the potatoes—a fact which prevents any cost comparison between the two years. There is nothing in the record to indicate that the yields, weather conditions, terrain, costs of labor, or other variables were similar for the two harvesting periods. The difference in harvesting equipment and the lack of proof of comparable conditions largely negate the relevancy of respondent's 1968 net income as it bears on estimating his lost profits in 1969.

Respondent asserts that McLean v. City of Spirit Lake, *supra*, best articulates the proper rule on proof of damages for lost profits; consequently, respondent compares that case to the case at bar in claiming respondent's lost profits are herein adequately established. In awarding lost profits to the plaintiff in McLean, this court stated:

"[I]t is our conclusion that the testimony of the plaintiff, evincing the gross receipts of the business for comparable periods, *the overhead expenses* and estimated profit derived by computation therefrom as a percentage of gross receipts, all based upon her prior experience in the operation of the business, was sufficient to enable the jury to determine respondent's loss of profits for the period of inoperation with reasonable certainty." McLean v. City of Spirit Lake, *supra*, 91 Idaho at 783, 430 P.2d at 674. (Emphasis added.)

An examination of the transcript in McLean v. City of Spirit Lake, *supra*, reveals the testimony which prompted the court to reach the above-quoted conclusion. The plaintiff in McLean, unlike respondent in the case at bar, testified about specific items of cost. She estimated her gross profits on food sales (food revenues over cost of food), and testified as to salaries of bartenders and waitresses, and the cost of other items comprising general overhead expenses. In this case respondent Jolley offered no competent evidence to support his estimate that his net profits would be 50% of his gross receipts. Therefore the award of $8,550 for lost profits was speculative and must be reversed.

Appellant also challenges the $5,000 award of exemplary damages, relying primarily on two main arguments—first, that appellant's conduct does not warrant an assessment of exemplary damages, and second, that the award, even if justified, is patently excessive.

The cases in Idaho are uniform in regard to the gravity of conduct and attendant state of mind of the defendant re-

quired to warrant an assessment of exemplary damages by the jury or trier of fact. As first stated in the case of Unfried v. Libert, 20 Idaho 708, 728–29, 119 P. 885, 891, rehearing 20 Idaho 730 (1911):

> "As we understand the rule of exemplary or punitive damages, they cannot be recovered unless the evidence shows clearly that the action of the wrongdoer is wanton, *malicious, or gross and outrageous*, or where the facts are such as to imply malice and oppression, in which case the law authorizes the court to allow a sum of money as punishment to the wrongdoer for the injury done
>
> . . . .
>
> "We think the general rule recognized by the weight of authority is that exemplary or plenary damages may be allowed where the injury complained of is attended by acts of the wrongdoer which show *willful malice, fraud, or gross negligence*." (Emphasis added.)

*Accord*: Boise Dodge, Inc. v. Clark, 92 Idaho 902, 453 P.2d 551 (1969); Zollinger v. Big Lost River Irrig. Dist., 87 Idaho 411, 364 P.2d 176 (1961).

▇ From the evidence introduced in the case at bar, it is manifest that appellant's conduct typified the conscious and wilful disregard of respondent's rights which justifies the imposition of an exemplary damages award. The district court specifically found that appellant's agents' acts were "deliberate, willful, malicious, and intentional and for the sole purpose of harassing [respondent]." The court further observed that appellant ignored explicit instructions not to take the equipment belonging to respondent. These findings are substantiated by competent evidence, and will not be disturbed on appeal. Summers v. Martin, 77 Idaho 469, 478, 295 P.2d 265 (1956).

▇ Concluding that exemplary damages were properly assessed, we must now resolve the more difficult issue—whether the amount of the exemplary damages award is excessive. In determining the excessiveness of an exemplary damages award, it is beneficial initially to reiterate the public policy or social purpose which the allowance of exemplary damages is intended to advance. The purpose of the exemplary damages award has been expounded in previous Idaho cases:

> "The existence of such a remedy serves useful, if limited, functions in the law *as a means of punishing conduct* which consciously disregards the rights of others *and as a means of deterring tortious conduct generally*." Boise Dodge, Inc. v. Clark, *supra*, 92 Idaho at 908, 453 P.2d at 557. *See* Williams v. Bone, 74 Idaho 185, 259 P.2d 810 (1953). (Emphasis added.)

Another purpose recognized by allusion is that the possibility of receiving an exemplary damages award encourages plaintiffs to bring suit against defendants whose significant acts of antisocial conduct might, because of their monetary insignificance, otherwise go unchecked. Cox v. Stolworthy, 94 Idaho 683, 496 P.2d 682 (1972); *see* D. Hodel, "The Doctrine of Exemplary Damages in Oregon" 44 Ore.L.R. 175, 182 (1965); *Note*, "Automobile Dealership Fraud: Punitive Damages, 7 Ida.L.R. 117, 121–22 (1970).

▇ As this court noted in Cox v. Stolworthy, *supra*, other authorities recognize that the predominant purpose of exemplary damages is to deter the defendant and others similarly situated from indulging in comparable conduct in the future. Any vindictive or vengeful punishment aspect of an exemplary damages award is de-emphasized by this line of authority. Cox v. Stolworthy, *supra*; *See* C. Morris, "Punitive Damages in Tort Cases," 44 Harv.L.R. 1173 (1931). We prefer to accentuate those cases which define the purpose of exemplary damages as a deterrent to the defendant and others from engaging in similar conduct in the future. We concede that any exemplary damages assessed against a defendant will appear to him to be punishment. However, we feel that the courts in these civil cases should be motivated primarily by a purpose of deterrence

and not by a purpose of punishment. In other words, the assessment of exemplary damages should be prompted by the court's or jury's desire to assure, to the extent possible via the imposition of a monetary penalty, that similar conduct does not occur in the future.[5] Punishment, per se, should be left to the criminal law. D. Hodel, *supra*, at 178–82.

Being mindful of the public purpose to be served by an award of exemplary damages, it is necessary to decide, in terms of a monetary award, how best to implement or advance such purposes. It is necessary to determine what size award will best accomplish the purposes of deterrence and (to some extent) punishment.

As detailed in Cox v. Stolworthy, *supra*, the previous Idaho cases considering exemplary damages are of little assistance in attempting to formulate manageable objective standards to govern the size of exemplary damages awards. The only parameters mentioned in those cases concerning the proper size of such an award are two rather general statements, used primarily in justifying this court's reduction of the trial court's award. Prefacing such a reduction, this court has stated:

> "Exemplary damages are not a favorite of the law, and the power to give such damages should be exercised with caution and within the narrowest limits." Williams v. Bone, *supra*, 74 Idaho at 189, 259 P.2d at 812. *See* Village of Peck v. Denison, 92 Idaho 747, 450 P.2d 310 (1969).

Oftentimes the court was inclined to supplement this general admonition by explaining:

> "While there is no fixed or mathematical proportion, ratio, or relation between the

amount of actual damages and the amount of exemplary or punitive damages, which in a proper case may be awarded, there is ample authority for the proposition that an award must not be so disproportionate to the actual damages sustained as to be the result of passion or prejudice rather than reason, and an award of exemplary damages must bear some reasonable relation or proportion to the actual damages, the real question being whether passion rather than reason dictated the verdict." Williams v. Bone, *supra*, 74 Idaho at 190, 259 P.2d at 813. *Accord*: Driesbach v. Lynch, 74 Idaho 225, 259 P.2d 1039 (1953).

The difficulty with these standards is that they provide no definable objective guidelines for determining what is a reasonable exemplary damages award; the standards appear to serve merely as manipulative vehicles by which the reviewing court can substitute its viscerally-dictated judgment for that of the trier of fact. *See generally* Summerfield v. Pringle, 65 Idaho 300, 316 et seq., 144 P.2d 214, 222 et seq. (1943) (J. Ailshie, dissenting); *Note*, "Exemplary Damages in the Law of Torts," 70 Harv. L.R. 517, 529–531 (1957).

In Cox v. Stolworthy, this court addressed itself to the necessary task of setting standards in order to arrive at exemplary damages awards which are "logically ordered, legally evaluated, and rationally judged." It is our task to utilize the standards developed in the comprehensive Cox opinion in the disposition of the issue at bar.

Cox v. Stolworthy, *supra*, involved a trespass to land which occurred when the defendant deliberately bulldozed a road across a segment of plaintiff's property for

---

5. *E. g.* Davis v. Georgia-Pacific Corp., 251 Or. 239, 445 P.2d 481 (1968); City of Chicago v. Shayne, 46 Ill.App.2d 33, 196 N.E.2d 521 (1964); Madison v. Wigol, 18 Ill.App.2d 564, 153 N.E.2d 90 (1958). *See* Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534 (1959); Sweaney v. United Loan and Finance Co., 205 Kan. 66, 468 P.2d 124 (1970); Rooks v. Brunch, 202 Kan. 441, 449 P.2d 580 (1969); Metro-

Chrysler-Plymouth, Inc. v. Pearce, 121 Ga.App. 835, 175 S.E.2d 910 (1970); Honaker v. Leonard, 325 F.Supp. 212 (E.D.Tenn.1971); Sperry Rand Corp. v. Electronic Concepts, Inc., 325 F.Supp. 1209 (E.D.Va.1970); Hinson v. Dawson, 244 N.C. 23, 92 S.E.2d 393 (1956). *See also* C. Morris, "Punitive Damages in Tort Cases," *supra*.

the purpose of "running" sheep over such a road. The jury therein awarded plaintiff compensatory damages of $1,500 for forage destroyed by the sheep trespassing, $100 for forage destroyed by the bulldozing, and $75 for costs of repairing a fence damaged by the bulldozing. The jury was submitted the issue of exemplary damages and awarded plaintiff $5,000 solely for the bulldozing incident. Defendant appealed to this court complaining primarily of the impropriety of the exemplary damages award.

In its opinion, the court noted that at least three factual patterns emerge from the exemplary damages cases. In characterizing the case therein, the court explained that none of the aggravating or opprobrious characteristics which typified two of the patterns of cases were present in Cox. The antisocial conduct in Cox involved simply a non-violent trespass to realty, the adjudication of which involved the rights of only two individuals. The court then proceeded to reduce plaintiff's exemplary award to $2,000. In so doing, the court noted that in such cases a large exemplary damages award has traditionally been held in disfavor. In other words, the generally paramount deterrent purpose can be accomplished without imposing an unduly prohibitive and revenge-oriented exemplary damages award. As guidance concerning the size of such an award, the court noted that exemplary damages should be based on certain added, but normally non-recoverable costs to the plaintiff in the litigation of his cause of action.

Thus, Cox v. Stolworthy concluded that as a general rule in cases where exemplary damages are justified, the award of such damages should approximate (1) reasonable and necessary attorney's fees, (2) expert witness fees and other necessary but non-recoverable litigation costs, and (3) reimbursement to the plaintiff for expenses and time lost both in the pursuit of the litigation and in the rectifi-

cation of wrongs occasioned by defendant's acts.

Cox v. Stolworthy recognized two categories of cases which justified an additional award of exemplary damages as an exception to the general rule set out above. Boise Dodge v. Clark, *supra*, is representative of one of those categories. In that case the defendant set back the odometers on demonstrator automobiles and sold them as new. The court concluded that exemplary damages of $12,500 were justified, even though the compensatory damages only amounted to $350.00. The additional punitive damages were necessary to remove the profit motive from the defendant's recurring business practice and to make it uneconomical for this defendant and for others similarly situated to engage in that type of deceptive practice.

The case of Village of Peck v. Denison, *supra,* is representative of the other category in which the court, in Cox v. Stolworthy, determined that an additional award of exemplary damages above those set out in the general rule was justified in order to adequately deter the defendant. In that case the village instituted an action to enjoin the defendants from interfering with the village water supply. The defendants had been engaged in a protracted quarrel with the village prior to the litigation concerning the defendants' rights to the water. When the village failed to recognize any right in the defendants, the defendants threatened to contaminate the village's drinking water supply and threatened to kill any village official who might enter upon defendants' land. The defendants' wrongful conduct in threatening the health and safety of nearly 200 inhabitants of the village amply justified an award of exemplary damages in the amount of $6,000 in order to deter that kind of conduct. Threats of violence, and malicious conduct which threatens the safety of others or results in injury or death require and justify more stringent measures in order to deter the acting party. In our opin-

ion, the two types of circumstances representsented by *Boise Dodge* and *Village of Peck* would justify submitting to the trier of fact the question of whether or not additional damages other than those specified in the general rule above are necessary in order to deter that kind of antisocial conduct.

■ By our specific attention to the facts in *Boise Dodge* and *Village of Peck* cases, we do not preclude the possibility that there may be other similar situations in which aggravating and dire circumstances necessitate the departure from the general rule of exemplary damages in Cox v. Stolworthy. However, the awarding of additional exemplary damages, in excess of those provided in that general rule, should be limited to the most extreme circumstances such as the calculated commercial fraud in *Boise Dodge* and the threat to the health, safety and welfare of a large number of persons represented in the *Village of Peck* case.

■ We now turn to the resolution of the issue at hand—whether the $5,000 exemplary damages award against Puregro was excessive under the circumstances in this case.

An examination of the record reveals that Puregro engaged in a knowing "business practice" of taking other persons' property and, when not immediately reclaimed, selling the same and retaining the funds. That brings this case close enough to the *Boise Dodge* case to justify an award of additional exemplary damages over and above those additional damages allowable under the general rule in Cox v. Stolworthy, i. e., reasonable attorney's fees, witness fees, and other noncompensable litigation costs including lost time and inconvenience. These latter costs would, under the general rule, justify an award of approxi-

mately $2,500. An additional $2,500 would not be unreasonable as a deterrent to prevent this kind of calculated business practice. Therefore, we do not feel that the trial court abused its discretion in awarding $5,000 as exemplary damages. Such an award will not only remove the profit motive of such a practice, but should deter the appellant and other foreclosing creditors from similar conduct.

The judgment of the trial court is affirmed as to the $150 compensatory damages for conversion and $5,000 exemplary damages, and reversed as to the $8,550 damages for loss of profits. The matter is remanded to the trial court for entry of judgment in accordance with this opinion.

Costs to respondent.

McFADDEN and DONALDSON, JJ., and SCOGGIN, District Judge, concur.

McQUADE, Chief Justice (concurring and dissenting).

I agree with the majority's resolution of the speculative damage and proper party issues. There is also considerable merit in the discussion of exemplary damages insofar as the majority extends and applies to this set of facts that analytical framework established in Cox v. Stolworthy, *supra*. However, I was compelled to dissent in that case from the majority's treatment of attorney's fees and related "out of pocket" expenses as elements of exemplary damages, when they are truly *compensatory*. The same problem is manifest in this case,[1] and doubtlessly will reappear often in future litigation. Unlike the player-queen in Shakespeare's "Hamlet", I do not wish to protest too much. But I would remind my colleagues on this occasion that the Court today is sealing its commitment to a policy of broadening the scope of recoverable

---

1. It is instructive to note that in this case the majority makes explicit a point camouflaged in Cox v. Stolworthy, *supra*, that attorney's fees and related expenses are elements of what the majority terms "exemplary damages," and are not merely measures of the maximum permissible awards.

costs without the requisite legislative authority.

In Cox v. Stolworthy, *supra,* I noted that the United States Supreme Court has twice held that attorney's fees should not be awarded as exemplary damages.[2] These decisions recognize that such awards, in reality, compensate the successful plaintiff through reimbursement of costs. They apply the general rule, that such costs are not recoverable unless agreed by the parties or expressly authorized by statute.[3] The distinction commonly employed to evade this rule, that inclusion of costs in exemplary damages punishes the defendant but does not compensate the plaintiff,[4] is transparent and unconvincing.

Compensation of the successful litigant by award of costs has been a creature of statute since the practice was commenced in England by the Statute of Gloucester in the year 1275.[5] The Idaho legislature has frequently addressed the issue, by authorizing the allowance of attorney's fees in a variety of situations.[6] However, it has declined to authorize the type of award made by the majority in the present case or in Cox v. Stolworthy, *supra.* Since there was no agreement by the parties on this question, I am forced again to conclude that the majority has usurped a firmly established legislative function by awarding attorney's fees and related costs. The result might be favored as a matter of public policy,[7] but that does not justify this Court's invasion of the legislative domain.

2. Oelrichs v. Spain, 15 Wall. (82 U.S.) 211, 21 L.Ed. 43 (1872); Day v. Woodworth, 13 How. (54 U.S.) 363, 14 L.Ed. 181 (1851).

3. *See,* e. g., the cases collected in Annotation, 30 A.L.R.3d 1443.

4. E. g., Brewer v. Home-Stake Production Company, 200 Kan. 96, 434 P.2d 828, 30 A.L.R.3d 1435 (1967).

5. 6 Edw. I, c. 1 (1275); *see generally,* Goodhart, Costs, 38 Yale L.J. 849 (1929).

6. I.C. § 28-35-202 (Uniform Commercial Credit Code, authorizing recovery by debtor in several types of actions against creditor who acted wrongfully); I.C. § 12-120 (authorizing award in all civil actions for injury to person or property where damages pleaded do not exceed $1500); I.C. § 54-1929 (laborer's and materialmen's liens against public works projects); I.C. § 30-1446 (violations of Securities Act); I.C. § 45-513 (mechanic's lien); I.C. § 62-409 (railroad killing stock); I.C. § 45-605 (wages); I.C. § 11-402 (redemption of property from execution sale); I.C. §§ 72-611, 702 (workmen's compensation).

7. *See,* e. g., McCormick on Damages, 255-259 (1935).