(No. 6398.   January 13, 1937.)

PETER DASHNEA, Respondent, v. PANHANDLE LUM-
BER CO., LTD., Appellant.

[64 Pac. (2d) 390.]

Gray & McNaughton, for Appellant.

J. Ward and Arney, for Respondent.

GIVENS, J.—April 29th, 1935, appellant and respondent entered into a written contract whereby respondent was to do the pond work for appellant and to receive therefor 20 cents per thousand feet, log scale, for logs brought to the bull-chain at the mill, and 15 cents per thousand feet for deadhead logs raised from the lake bottom. It was agreed that appellant would advance labor costs on the contract and that the wages of the men so employed should not exceed 42½ cents per hour.

A general raise in all wages for sawmill and pond workers was made effective June 1, 1935, by the LLLL organization, and notices posted by appellant in and about its mill to that effect. Under this new wage scale respondent's men were paid at the rate of 50 cents and 52½ cents per hour by appellant and the sums charged to respondent's account on the contract. Respondent himself was paid twice a month according to the terms of the written contract, after deducting the amounts paid his employees, and thirty days after the completion of the work he was paid the ten per cent hold-back.

Respondent brought this action for the total cost of the increase in wages paid his employees, alleging an oral agreement between appellant and respondent whereby appellant would absorb the wage increase and the matter be adjusted. The jury returned a verdict for $545 in favor of respondent, and this appeal is from the judgment entered thereon.

Appellant's first specification of error is that the verdict of the jury is contrary to the court's instructions and is contrary to law, and the second specification of error is that the judgment is contrary to law in that the evidence is insufficient to support it.

Appellant first argues that no modification of the original contract was shown by the evidence. Upon this point the evidence is in conflict. Mr. Dashnea testifying (conversation with the manager, Mr. Dimeling):

"A. Well, after around the 10th—between the 10th and 15th of June, they posted a notice raising wages but didn't say nothing to me about it, but they told me the time keeper turned the time in at four and four-twenty a day but I told them not until I saw Mr. Dimeling, but I didn't see Mr. Dimeling for a couple of days, and when I saw him he told me he would make an adjustment in the difference.

"Q. $4.00 and $4.20 a day?

"A. Yes.

"Q. That would be on a basis of fifty and fifty-two and one-half cents an hour?

"A. Yes, sir."

(His conversation with the superintendent.)

"A. I took it up with Mr. Kemp that we couldn't do the work for that price and pay this wage, but he told me he would make an adjustment."

(As to a former adjustment.)

"Q. Did you say you had an adjustment of another contract?

"A. Yes, sir.

"Q. What year was that?

"A. 1933.

"Q. What adjustment was that?

"A. Raised me two cents, I think, a thousand, when they raised the pay forty cents a day.

"Q. How much did that amount to?

"A. It amounted to between four and five hundred dollars?"

(On cross-examination.)

"Q. Didn't Mr. Kemp, after he talked with you, say he would go and see Dimeling first and then come and talk with you after the 1st of June?

"A. No.

"Q. Didn't you see Mr. Kemp shortly after the 1st of July about this matter?

"A. Yes.

"Q. What did he tell you at that time?

"A. He told me he would make an adjustment.

"Q. That he would make an adjustment?

"A. Yes, sir.

"Q. What was the condition of that adjustment?

"A. To give—pay the difference in wages."

Oliver Dashnea who was present at the conversation between his father and Mr. Kemp testified:

"A. They asked him about the raise and he·said he would fix it up after the first of the month. They were starting to cut yellow pine and the 1st of the month they would fix it up. They was making pretty good on yellow pine."

Mr. Sabin testified to the conversation between respondent and Mr. Dimeling as follows:

"A. It was about the 15th of June and the old gentleman came down there—Mr. Dimeling, I mean—and he asked him for a raise and he says he 'didn't need to worry about that

Mr. Dashnea, we fixed it up once and we will fix it up again with you.' "

. On the other hand, Mr. Kemp, the mill superintendent testified:

"A. Well, Peter said, as he said on the stand, that he couldn't pay the men the wages and make anything at that rate unless he had a raise. I told him I would take it up with Mr. Dimeling and tell him later."

. . . . . . . . . . . . . . . .

"A. I told him Mr. Dimeling instructed me to let it ride through the month of June and, if it was necessary to make an adjustment, it would be made on the 1st of July."

. . . . . . . . . . . . . . . .

"Q. Did you tell him if his men didn't make wages and he himself, there would be an adjustment?

"A. I did.

"Q. And it was going on through June?

"A. The contract work was going on through June as it was."

. . . . . . . . . . . . . . . .

"A. Why, he asked me if I had talked to Mr. Dimeling or had said anything to me since the 1st of July, and I said, 'yes, he did'. And he wanted to know what it was and I told him Mr. Dimeling had checked it up and he made very well and it would have to ride as it was."

(On cross-examination.)

"Q. And then you told him, that if it were necessary to make an adjustment after the 1st of July, it would be made, is that right?

"A. I did.

"Q. Now then, what was to determine what was necessary or not?

"A. Well, there is times, Mr. Arney, the contractors don't make wages for the men—for the men and for themselves, but if they can't then it is necessary for the company to absorb that."

Witness Moran, secretary of appellant, testified as to the amounts paid respondent under this contract, and with respect to the adjustment in 1933 said:

"Q. Do you recall any adjustment having been made for Mr. Dashnea in 1933?

"A. No, I don't recall for sure, but it seems to me as if his contract was eighteen—was raised to twenty, but I can't say definitely when that was done."

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. Why, if I remember right, it was only 2 cents a thousand raise, just changed on the contract rate.

"Q. That was when the N. R. A. went into effect?

"A. Yes, I remember it was when the N. R. A. went into effect.

"Q. Do you know whether it was necessary to make him this for his and his men's wages?

"A. Yes, it was necessary to do so at that time."

(On cross-examination.)

"Q. And the repair of all these booms had to come out of this man's pocket, didn't it?

"A. Yes, his wages."

(On re-direct.)

"A. His average daily wage was $10.13 a day."

Mr. Dashnea on redirect examination stated:

"Q. Will you just tell the jury some of the expenses you had to pay out of that in order to maintain and operate your contract?

"A. It was costing me about $40.00 to $45.00 a month it cost me for operation and keeping my boat up. Besides I had to spend five or six hundred dollars every season. They were sinking and I had to build good booms right along.

"Q. These booms are left on the property?

"A. These are left there. I spend over $1600.00 for booms."

There is thus substantial evidence, though conflicting, that appellant would take care of respondent as a consequence of the raise in wages, and that respondent relied thereon upon the strength of a former arrangement in 1933. In the face of this evidence, considered with the instructions covering the same, and not complained of by appellant, this court cannot reverse the verdict of the jury upon this point, under its well-established rule.

Appellant urges that there was an accord and satisfaction by respondent's receiving and indorsing the semi-monthly checks, which recited thereon "in full settlement for labor. . . . . " Under the instruction given,[1] requested by appellant, the law governing accord and satisfaction was substantially stated, and there was enough evidence to sustain the verdict in respondent's favor on this point. (*Heath v. Potlatch Lumber Co.*, 18 Ida. 42, 108 Pac. 343, 27 L. R. A., N. S., 707; note, 75 A. L. R. at 914; 1 C. J. 583, secs. 152, 153.)

Appellant's main contention is that there was no valid consideration shown by the evidence for the alleged promises of the increased wages, relying upon cases wherein the general rule is well stated to the effect that where a party merely does that which in law he is bound to do, he cannot demand any additional pay therefor; and if he obtains an additional promise from the other party, it is *nudum pactum* and unenforceable. There is however this further principle to the effect that the doing by one of the parties of something that he is not legally bound to do constitutes consideration for the other's promise to modify the terms of the original agreement. In *Independent School Dist. No. 6 v. Mittry*, 39 Ida. 282 at 289, 226 Pac. 1076, it was stated that: " . . . . It is elementary that a promise to do, or the doing of, what one is already bound by contract to do, is not a valid consideration. (1 Williston on Contracts, secs. 130, 130A.) But the matter goes even deeper than that. If respondents were not bound to do the rock work under the contract, but did it with the knowledge of the board, and appellant received the benefit of it, then appellant would be

---

[1] "INSTRUCTION No. 4.

In this case the defendant alleges and claims that there were monthly settlements on the contract and a final settlement between the parties and that the full amount due the plaintiff upon such settlements has been paid by the defendant, and accepted by the plaintiff in full for the said services.

You are instructed that if you find from the evidence that such final settlement and payment was had and made and accepted by the parties, it is final and binding ·upon them and the plaintiff cannot recover in this action."

bound to pay for it, and certainly could not recover the amount when paid."

Cases from other jurisdictions, and the texts fully support this proposition. (*Whitehouse v. Green,* 81 Pa. Super. Ct. 386; *Straw v. Temple,* 48 Utah, 258, 159 Pac. 44, at 48; *Savage v. North Anson Mfg. Co.,* 124 Me. 1, 124 Atl. 721 at 724; 13 C. J. 355, sec. 213, n. 63; 6 R. C. L. 918, sec. 302, n. 20. (See *Blakeslee v. Board of Water Commrs.,* 106 Conn. 642, 139 Atl. 106, 55 A. L. R. 1319 at 1325 et seq. for discussion of rules and holdings, and *Russell & Barbour v. Lambert,* 14 Ida. 284, 94 Pac. 54, L. R. A. 1915B, 20; note, 55 A. L. R. 1333 et seq.)

In the instant case, pursuant to posted notices at the instance of appellant and the LLLL organization, respondent raised the wages he was to pay his employees, thereby parting with value in addition to that which he was legally bound to pay, acquiesced in, and even paid by appellant. While this increase was paid to respondent's men the payments inured to the benefit of appellant, and constituted a valid consideration for appellant's promise to pay respondent. The situation herein differing from the cases cited by appellant in that respondent at no time refused to perform, but continued to fulfill not only the written contract, but also made payments not required by that contract, apparently relying upon a previous settlement of a similar kind, and the agreement of the company that it would in turn fulfill its promise of additional payments.

Judgment affirmed. Costs to respondent.

Morgan, C. J., Holden, Ailshee and Budge, JJ., concur.