626 P.2d 767

**MASSEY–FERGUSON CREDIT CORPORATION,**
Plaintiff-Appellant,

v.

**Arthur PETERSON,**
**Defendant-Respondent.**

**No. 12909.**

Supreme Court of Idaho.

Dec. 24, 1980.
Dissenting Opinion Jan. 22, 1981.
Rehearing Denied April 20, 1981.

112

Robert M. Nielsen, of Ling & Nielsen, Rupert, for plaintiff-appellant.

Jay D. Sudweeks, of May, May, Sudweeks & Shindurling, Twin Falls, for defendant-respondent.

BAKES, Justice.

This case concerns the question of damages arising from appellant Massey-Ferguson Credit Corporation's repossession of farm equipment owned by respondent Arthur Peterson. In a previous appeal, *Massey-Ferguson Credit Corp. v. Peterson*, 96 Idaho 94, 524 P.2d 1066 (1974) [*Massey-Ferguson I*], we declared Idaho's prejudgment claim and delivery statute, former I.C. §§ 8–301 *et seq.*, to be unconstitutional. In this appeal, we address the issue of Massey-Ferguson's liability, if any, for utilizing that unconstitutional statute to repossess Peterson's equipment.

In September, 1970, respondent Peterson assumed a retail installment contract on a Massey-Ferguson combine. Peterson's brother-in-law had previously purchased

this combine from Zitlau Motors and had fallen behind on the payments. In November of the same year respondent purchased another Massey-Ferguson combine from Zitlau's under another retail installment contract. In June of 1971 respondent purchased a diesel tractor from the same dealer also under a retail purchase contract. Zitlau Motors assigned its interest under all these contracts to Massey-Ferguson Credit Corporation. U.C.C. financing statements were duly executed and filed.

Peterson used the equipment in farming operations and in custom farm work during 1971. In December, 1971, Peterson failed to make payments due under the contracts. At this time Peterson and appellant Massey-Ferguson Credit Corporation, acting through its area finance manager, Moore, entered into an extended series of negotiations in an attempt to bring the overdue contracts into a satisfactory state. Moore contacted Peterson almost every other week. Peterson made several promises to bring the contracts current. Those promises were never kept. The total amount past due under the contracts was slightly in excess of $11,000. On July 6, 1972, Peterson made a payment of $800 to appellant. Respondent Peterson claims that he and Moore had agreed that the payment would be credited toward the amount due on the tractor. Moore denied this. Moore applied the $800 payment to the amount due on one of the combines because, he testified, it was the oldest contract and had the largest amount due. At this time, the amount overdue on the tractor was approximately $3,000.

In late July, 1972, Peterson allowed Massey-Ferguson to take possession of one of the combines. Peterson asserts that at this time Massey-Ferguson agreed to permit him to use the other combine and the tractor "into the season." Massey-Ferguson admits that it agreed to allow Peterson to continue to use the equipment, but contends that Peterson was told he would have only one more week; that if payments were not made within the week, the remaining equipment would be repossessed.

After the agreed upon repossession of the first combine, there was no further contact between Peterson and Moore. Peterson failed to make any further payments and on August 4, 1972, Moore, acting on advice of counsel, instituted the instant action.[1] In its complaint Massey-Ferguson sought to have the various items sold pursuant to the U.C.C. and to apply the proceeds to the balances due. It also sought a deficiency judgment in the event the debt exceeded the proceeds from the resale. As a part of the action, the appellant sought possession of the second combine (still in Peterson's possession) and the tractor pursuant to the Idaho claim and delivery statute, I.C. § 8–301 *et seq.* As required by the claim and delivery statute, appellant filed a bond and an affidavit for possession of the second combine and the tractor. The affidavit was addressed to the sheriffs of Gooding and Jerome Counties. On August 4, 1972, the Gooding County sheriff went to Peterson's farm accompanied by Moore and employees of Zitlau Motors. Peterson was not at home. The sheriff served Peterson's wife with a copy of the affidavit, undertaking and notice. Peterson's wife asked if she could call her lawyer, and the sheriff permitted her to do so. After discussing the matter with her lawyer, Peterson's wife did not object to the removal of the tractor. Peterson contends that his wife's apparent acquiescence was a result of her realization of the futility of any resistance. Massey-Ferguson contends that her acquiescence was more akin to consent.

Also on August 4, the Jerome County sheriff, accompanied by Moore, took possession of the second combine, which was located on a farm where Peterson was custom

1. There is some evidence in the record that on August 4, respondent's father-in-law, Goss, went to Zitlau Motors purportedly to pay the arrearages on respondent's behalf. Goss talked to the proprietor of Zitlau, but before anything was settled the proprietor left. After waiting for him to return, Goss left and made no further efforts to pay the arrearages. The record indicates that the respondent, who was the debtor, was not even aware of this contact by his father-in-law.

harvesting grain. Peterson was not on the farm at the time the sheriff took possession. The sheriff cut a chain or padlock in order to remove the combine. The severed chain or padlock belonged to the owner of the farm.

On August 10, 1972, Massey-Ferguson sent a letter to Peterson notifying him that he had until August 28, 1972, to redeem the equipment or it would be sold at private sale. During the period of redemption Zitlau Motors, on behalf of Massey-Ferguson, arranged to sell the repossessed items. The ultimate buyers of the tractor and one of the combines had possession of and made payments on the equipment prior to August 28. Peterson contends, and the trial court so found, that the sales of the tractor and the combine were completed prior to the expiration of the redemptive period. Massey-Ferguson contends that the sales were not completed until after August 28, and that any commitments made prior to that time were expressly conditioned upon respondent's failure to exercise his right of redemption. Peterson himself made no effort to redeem the collateral, allegedly because he thought any such efforts would prove useless.

On August 25, 1972, Peterson filed his answer to the appellant's complaint, generally denying the allegations thereof, and also counterclaiming against appellant for an allegedly unconstitutional seizure of the property, seeking general and punitive damages, costs and attorney fees. The basis for the respondent's counterclaim was the United States Supreme Court's landmark decision of *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), handed down on June 12, 1972, less than two months before the repossession. *Fuentes* struck down a Florida prejudgment replevin statute on the grounds that it failed to afford debtors any opportunity to be heard prior to the time their property was repossessed and thus constituted a deprivation of property without procedural due process of law in violation of the Fourteenth Amendment to the United States Constitution.

Massey-Ferguson filed a motion to dismiss Peterson's counterclaim. The trial court, treating the motion as a motion for summary judgment, found in favor of Massey-Ferguson and dismissed the counterclaim. This Court reversed on appeal. *Massey-Ferguson Credit Corp. v. Peterson*, 96 Idaho 94, 524 P.2d 1066 (1974). We held that the Idaho claim and delivery statute was constitutionally defective in that it failed "to provide for judicial supervision of the issuance of the order [for repossession], and the lack of any provision for a certain, immediate judicial hearing on the validity of the taking of the property . . . ." *Id.* at 99, 524 P.2d at 1071. This Court also stated that "[w]e find nothing which precludes a debtor from filing a damage action for wrongful taking of property as filed by [Peterson] in this case." *Id.* at 99, 524 P.2d at 1071.

Upon remand a trial was had before the district court. The district court entered judgment denying Massey-Ferguson's claim for a deficiency of $3,488.39 and awarding Peterson $10,000 general damages and $20,000 punitive damages, together with $13,677.50 in attorney fees and $374.25 in costs. The trial court found that Peterson's general damages stemmed from: loss of profits suffered as a result of his inability to perform custom farm work for the remainder of the season; losses suffered as a result of having to pay others to do farm work on his own farm; and damages due to emotional distress and embarrassment. The trial court denied appellant's claim for a deficiency judgment on the grounds that the repossession and resale of the equipment were not undertaken in a commercially reasonable manner. *See* I.C. § 28–9–504(3).

I

Appellant raises a number of issues on appeal. First, Massey-Ferguson maintains that the award of general damages is speculative and unsubstantiated by the evidence. It points to several glaring mathematical errors in the calculation of lost profits. Because we reverse the trial court's award of general damages on a single ground, we

need not address all of appellant's allegations of error.

■ At the outset, we observe that there are two uncontroverted facts which affect the decision in this case. First, Massey-Ferguson did cause respondent to be deprived of his property without procedural due process by resorting to the procedurally unconstitutional claim and delivery statute. *Massey-Ferguson Credit Corp. v. Peterson*, 96 Idaho 94, 524 P.2d 1066 (1974). Secondly, it is clear that Peterson was in default and that under the U.C.C. Massey-Ferguson was entitled to possession of the collateral.[2] Peterson contends that this latter factor is immaterial; that the determinative fact in this case is the admitted deprivation of constitutional rights. We disagree.

In the recent case of *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the United States Supreme Court discussed the propriety of general damages in cases involving deprivations of procedural due process. The Court held that where the deprivation of a protected liberty or property interest is substantively justified, but procedurally defective, the plaintiff is ordinarily entitled to recover only nominal damages. The Court reasoned that, the importance of procedural due process notwithstanding, actual damages are not inherent in situations where the deprivation of the protected interest would have occurred even had procedural safeguards been satisfied. *See Bowler v. Board of Trustees*, 101 Idaho 537, 617 P.2d 841 (1980). We think *Carey* is controlling.

In the instant case, it is now clear that if appellant had repossessed the combine and tractor by itself, relying on its U.C.C. security interest, it would not have run afoul of the fourteenth amendment due to the absence of state action. *See, e. g., Benschoter v. First National Bank of Lawrence*, 218 Kan. 144, 542 P.2d 1042 (1975), *appeal dismissed*, 425 U.S. 928, 96 S.Ct. 1656, 48' L.Ed.2d 170 (1976).

In *Massey-Ferguson I*, we declared appellant's actions to be constitutionally impermissible because it had resorted to Idaho's claim and delivery statute, thereby invoking the power of the state without giving the debtor notice and an opportunity to be heard. At the time *Massey-Ferguson I* was decided in 1974, it was not clear whether the U.C.C. provision authorizing self-help repossession, I.C. § 28–9–503, was similarly defective. Several commentators and judges felt at that time that the necessary component of state action was supplied by the legislature's acquiescence to and authorization of self-help repossessions without requiring contemporaneous procedural safeguards. *See Adams v. Egley*, 338 F.Supp. 614 (S.D.Cal.1972), *rev'd sub nom. Adams v. Southern California First National Bank*, 492 F.2d 324 (9th Cir. 1974), *cert. denied*, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974); *Watson v. Branch County Bank*, 380 F.Supp. 945 (W.D.Mich.1974), *rev'd without opinion* 516 F.2d 902 (6th Cir. 1975); Clark & Landers, *Sniadach, Fuentes* and Beyond: The Creditor Meets the Constitution, 59 Va. L.Rev. 355 (1973); Dauer & Gilhool, The Economics of Constitutionalized Repossession: A Critic for Professor Johnson, and a Partial Reply, 47 S.Cal.L.Rev. 116 (1973); Note, Secured Transaction—Repossession by Self-Help Under U.C.C. § 9–503 is a Violation of Due Process of Law, 24 Syracuse L.Rev. 867 (1973).

---

**2.** The Code specifically authorized Massey-Ferguson to use self-help to repossess the chattel:

"28–9–503. SECURED PARTY'S RIGHT TO TAKE POSSESSION AFTER DEFAULT.— Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral

and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under section 28–9–504."

The retail installment contract and security agreement executed by the parties also gave Massey-Ferguson the authority to take possession of the equipment in the event of Peterson's default.

About the same time or shortly after we decided *Massey-Ferguson I*, the federal circuit courts were in the process of unanimously deciding that self-help repossession under the Code did not involve state action to the extent necessary for application of fourteenth amendment procedural safeguards. *Shirley v. State National Bank of Connecticut*, 493 F.2d 739 (2d Cir. 1974), *cert. denied*, 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284; *Gibbs v. Titelman*, 502 F.2d 1107 (3rd Cir. 1974), *cert. denied* 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974); *James v. Pinnix*, 495 F.2d 206 (5th Cir. 1974); *Turner v. Impala Motors*, 503 F.2d 607 (6th Cir. 1974); *Bichel Optical Lab., Inc. v. Marquette Nat. Bk. of Mpls.*, 487 F.2d 906 (8th Cir. 1973); *Nowlin v. Professional Auto Sales, Inc.*, 496 F.2d 16 (8th Cir. 1974), *cert. denied* 419 U.S. 1006, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); *Adams v. Southern California First National Bank, supra*. State courts were also unanimous in finding no state action. *See, e. g., Benschoter v. First National Bank of Lawrence, supra*, and cases cited therein. *Cf. Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (U.C.C. self-help provision for enforcement of warehouseman's lien, *see* I.C. § 28–7–210, does not constitute state action).

Therefore it is now clear that if Massey-Ferguson had carried out this repossession by itself, Peterson would have had no actionable claim at all. Instead, Massey-Ferguson, apparently acting out of an abundance of caution, turned to the Idaho claim and delivery statute. This course of action amounted to at most a technical violation of procedural due process requirements, entitling plaintiff to nominal damages only. *Bowler v. Board of Trustees*, 101 Idaho 537, 617 P.2d 841 (1980).

It cannot be presumed that Peterson lost profits and was unable to work his own farm merely because Massey-Ferguson made the mistake of repossessing his equipment pursuant to the invalid claim and delivery statute, rather than resorting to self-help repossession. *Carey v. Piphus, supra*, makes it clear that damages do not automatically flow from the utilization of defective due process procedures. The rule of the *Carey* case, which is really bottomed on principles of causation, requires a showing that the use of the constitutionally defective procedure itself must have caused the injury where the debtor was not otherwise entitled to continued possession of the property. Thus, in order to prove that he was damaged, Peterson must have shown that but for the procedural shortcomings of the repossession, he would have been able to retain possession of the farm machinery. It was not the method, but the fact of repossession which left Peterson without his equipment.

The trial court also found that Peterson suffered emotional harm. In *Carey* the Supreme Court made it clear that "mental and emotional distress caused by the denial of procedural due process itself is compensable," *Carey v. Piphus*, 435 U.S. at 264, 98 S.Ct. at 1052, 55 L.Ed.2d at 265, but again cautioned that such distress must be attributable to the deficient procedure itself. The court below did find that Peterson "suffered emotional distress and embarrassment due to the repossession and the calling of [Peterson's clients] to explain that he could not do the custom farm work." Peterson's explanation of the cause of his distress and embarrassment was the loss of his farm equipment, not the method of repossession.

We therefore conclude that respondent is entitled only to nominal damages. All of Peterson's alleged damages occurred not as a result of the procedural deficiencies in Massey-Ferguson's claim and delivery repossession, but rather from the fact that Peterson no longer had possession of the equipment. According to the U.C.C. and the parties' retail installment contracts, Peterson was in default and not entitled to possession.

## II

We turn now to Massey-Ferguson's contention that the court below erred in awarding punitive damages to Peterson. The Supreme Court in *Carey* did not pre-

clude the possibility that exemplary or punitive damages could be awarded "to deter or punish malicious deprivations of rights," even in cases warranting only nominal damages. *Carey v. Piphus*, 435 U.S. at 266, 98 S.Ct. at 1054, 55 L.Ed.2d at 266. *See also* 435 U.S. at 257, n. 11, 98 S.Ct. at 1049, 55 L.Ed.2d at 260–61; *Burt v. Abel*, 585 F.2d 613 (4th Cir. 1978); *Hartford Accident & Indemnity Co. v. Village of Hempstead*, 48 N.Y.2d 218, 422 N.Y.S.2d 47, 397 N.E.2d 737 (1979). Similarly, this Court has held that a plaintiff may recover punitive damages without proving that he is entitled to more than nominal damages. *Aztec, Ltd., Inc. v. Creekside Investment Co.*, 100 Idaho 566, 602 P.2d 64 (1979).

This Court has recently taken yet another close look at the propriety of punitive damages.

> "In Idaho punitive damages are reserved for the most unusual and compelling circumstances. The reason for their disfavor may be their emphasis on punishment and deterrence of the defendant rather than compensation of the plaintiff, an atypical role for civil damages. It is well established that punitive damages 'are not a favorite of the law, and the power to give such damages should be exercised with caution and within the narrowest limits.' *Williams v. Bone*, 74 Idaho 185, 189, 259 P.2d 810, 812 (1953). This court will sustain an award of punitive damages only when it is shown that
>
> > 'there has been an injury to the plaintiff from an act which is *an extreme deviation from reasonable standards of conduct*, and that the act was performed by the defendant with an understanding of or a disregard of its likely consequences . . . .' *Linscott v. Rainier Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980)." *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 851, 606 P.2d 944, 955 (1980) (emphasis added).

We find it unnecessary to undertake another lengthy analysis of Idaho's punitive damages cases. We have closely examined the conduct of Massey-Ferguson's representatives and conclude that it does not constitute "an extreme deviation from reasonable standards of conduct." Although we have affirmed punitive damage awards in other wrongful repossession actions, *Thompson v. Dalton*, 95 Idaho 785, 520 P.2d 240 (1974); *Jolley v. Puregro*, 94 Idaho 702, 496 P.2d 939 (1972), we find no comparable conduct in this case.

Respondent directs our attention to a number of facts which he alleges support the trial court's punitive damage award. The first example of allegedly egregious conduct is the cutting of the chain or padlock by the sheriff of Jerome County. This occurred when the sheriff, accompanied by Moore, took possession of the combine on a farm where respondent was custom harvesting grain. The chain or padlock did not belong to respondent, but rather to the owner of the farm. Peterson was not present at the time of repossession.

■ The trial court, presumably referring to I.C. § 28–9–503, called the cutting of the chain or padlock a "breach of the peace." Section 9–503 of the U.C.C. gives the creditor two choices upon the debtor's default. The secured party may institute legal proceedings or he may resort to self-help repossession "if this can be done without a breach of the peace." The peaceful repossession requirement is not applicable when the creditor resorts to judicial action. Therefore, when the secured party avails itself of judicial process, which Massey-Ferguson did when it utilized Idaho's claim and delivery statute, we must look to the statute governing that process in order to determine whether the repossession was properly conducted.

■ The claim and delivery statute in effect at the time of the repossession specifically authorized the sheriff to use some degree of force. Former I.C. § 8–309 (repealed, 1973 Idaho Sess.Laws ch. 118, § 1, p. 220) permitted the sheriff to break open buildings or enclosures if the property was not delivered. This provision was substantially carried over to the new claim and delivery statute, and is currently codified in I.C. § 8–305. The new statute now provides

the debtor with a pre-seizure notice and hearing, I.C. § 8–302, and thus does not suffer from the constitutional defect detailed in *Massey-Ferguson I.* Significantly, however, the new statute does not eliminate the sheriff's authority to break open enclosures, but merely requires that he act "in such manner as he reasonably believes will cause the least damage to the building or inclosure." I.C. § 8–305. In view of these statutes, the cutting of the chain or padlock by the sheriff did not amount to misconduct or a breach of the peace. It can hardly be termed malicious, wanton, or an extreme deviation from reasonable conduct.

Furthermore, even if the conduct in question were to be analyzed in the context of a U.C.C. self-help repossession, we would be compelled to conclude that no "breach of the peace" had taken place. When Moore and the sheriff arrived at the farm in order to repossess the combine, no one was present. The farmer and his son appeared on the scene while the combine was being prepared for removal. There is no indication in the record of any oral protest on the part of the farmer or his son. *See* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 26.6 (1972). Peterson was not present. *See Helfinstine v. Martin*, 561 P.2d 951 (Okl. 1977). The chain securing the combine did not belong to Peterson. The repossession did not even occur on his property. *See Benschoter v. First National Bank of Lawrence*, 218 Kan. 144, 542 P.2d 1042 (1975), *appeal dismissed* 425 U.S. 928, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976). Nor does the record reflect any possibility of violence or physical confrontation. *See, e. g., Harris Truck & Trailer Sales v. Foote*, 58 Tenn.App. 710, 436 S.W.2d 460 (1968), *cert. denied* (1968). The mere fact that a vehicle is locked or, as in this case, chained at the time of repossession is not dispositive. The conduct in question did not create a disturbance amounting to a breach of the peace.[3]

■ Respondent also relies on the fact that appellant completed the sale of some

of the repossessed equipment prior to the expiration of the period of redemption. As we will discuss later, respondent is not without a remedy under the U.C.C. for any damage caused by the premature sale. *See also* I.C. § 28–9–507. Although such conduct may be termed "commercially unreasonable" under the U.C.C., we do not believe it justifies an award of punitive damages.

Moore testified, and Massey-Ferguson introduced other evidence, to the effect that any commitments made by Massey-Ferguson prior to August 28, the end of the redemptive period, were expressly conditioned on Peterson's failure to redeem the collateral. Moore testified that it was necessary to promptly make such commitments, including permitting the use of the equipment prior to the end of the redemptive period, in order to make certain that the equipment would be sold before the harvesting season was substantially underway. Moore explained that if the equipment was not sold until later in the harvesting season, it would not sell until the next harvest season and thus would depreciate in value even though it had not been used. The trial court found that sale of two of the pieces of equipment was "completed" before August 28. Unfortunately, it is difficult to determine whether in fact the sale was conditioned on Peterson's failure to redeem, since, in spite of the fact that he had been informed by letter that he had until August 28 to redeem, he never tendered any funds or made any effort to redeem the collateral. Ironically, Peterson filed his answer and counterclaim on August 25, three days prior to the expiration of the redemptive period, and yet made no attempt in that action to either enjoin the sale of the collateral or to redeem it.

Although Massey-Ferguson's efforts to sell the collateral prior to August 28 might be viewed as being "commercially unreasonable" and not in literal compliance with U.C.C. requirements, it is not the type of conduct justifying an award of punitive

---

**3.** In fact, I.C. § 28–9–503 *authorizes* the repossessing creditor to *disable* equipment, including farm equipment, I.C. § 28–9–109(2) *on the debtor's premises.*

damages. If it were, then a finding of commercial unreasonableness under the U.C.C. would almost always merit an award of punitive damages.

■ Peterson also points to the trial court's finding that "the repossession of [the combine] was in violation of the agreement of the parties to allow defendant to work the combine into the season to generate funds to make the payments." However, we are unable to find any support in the record for the trial court's conclusion. Where the findings of a trial court are clearly erroneous, we must set them aside. I.R.C.P. 52(a); *Marshall Bros., Inc. v. Geisler*, 99 Idaho 734, 588 P.2d 933 (1978); *Russ Ballard v. Lava Hot Springs Resort, Inc.*, 97 Idaho 572, 548 P.2d 72 (1976).

First, the trial judge's memorandum opinion is internally inconsistent. On page 1 of his decision, the judge writes: "At the time the action was commenced, defendant had already voluntarily returned one (1) combine and had previously agreed to return a combine and tractor if payments were not made before August 4, 1972." Later, he writes: "Just before the repossession, the defendant voluntarily relinquished possession of one of the combines. He was led to believe that if this was done he could, as a custom farmer, work into the season with the other combine in [an] attempt to come up with the payment."

Secondly, Moore testified that near the end of July he and Peterson agreed that Peterson would voluntarily return one combine, and would be permitted another week to either make payment or relinquish possession of the other combine. Peterson did not contradict Moore's testimony. The only statement in Peterson's testimony which could possibly be construed to mean that Moore agreed to permit him to use the equipment "into the season" as opposed to an additional week, was Peterson's statement that Moore agreed to let him use such equipment "for a week or so."[4] Since we are unable to find any substantial evidence in the record supporting the trial court's finding that respondent should have been permitted to use the equipment "into the season," we must set that finding aside.

■ Even assuming that Massey-Ferguson did promise to allow Peterson to utilize the second combine and tractor "into the season," we doubt whether such promise would have constituted an enforceable contract. The promise to forego immediate repossession is unsupported by any consideration running from Peterson to Massey-Ferguson. True, Peterson may have promised to voluntarily relinquish possession of one of the combines. However, he was already bound by the terms of the security agreements to permit repossession upon default. "[T]he general rule is well stated to the effect that where a party merely does that which in law he is bound to do, he cannot demand any additional pay therefor; and if he obtains an additional promise

---

4. At trial, Peterson responded as follows to questioning by his own counsel:

"Q. What discussion, what conversation took place?

"A. We gave him the $800 and we discussed if I would give this one up voluntarily, if he could arrange it for a week or so so I could thrash enough grain to make up this payment."

Cross examination by opposing counsel produced the following exchange:

"Q. Mr. Peterson, isn't it a fact that Mr. Moore told you repeatedly that he couldn't allow you to take the machines into season, meaning the combines?

"A. Yes, he told me several times."

Opposing counsel also introduced into the trial record the following excerpt from Peterson's deposition:

"Q. What was the deal regarding the other combine and the tractor on the 28th [of July]? You say you talked with Mr. Moore and worked out a deal. Did he tell you that if you gave him that combine you could use the other combine during the remainder of the season?

"A. He did. Well, he said for—He'd give me a week or so in order for me to get partial, or make it satisfactory for the finance company, yes.

"Q. And if you were unable to obtain financing, what was your obligation?

"A. He would take the machines.

"Q. Did he agree to this?

"A. Yes."

from the other party, it is *nudem pactum* and unenforceable." *Dashnea v. Panhandle Lumber Co., Ltd.,* 57 Idaho 232, 238, 64 P.2d 390, 393 (1937). *Accord, Independent School Dist. No. 6 v. Mittry,* 39 Idaho 282, 226 P. 1076 (1924); *Apperson v. Security State Bank,* 215 Kan. 724, 528 P.2d 1211 (1974); *Heckman & Shell v. Wilson,* 158 Mont. 47, 487 P.2d 1141 (1971); *Johnson v. Tanner,* 59 Wash.2d 606, 369 P.2d 307 (1962). Since Peterson promised to do nothing more than he was already legally bound to do, any promise by Massey-Ferguson to extend the terms would have been unenforceable for want of consideration.

■ We conclude that the trial court erred in awarding punitive damages. The repossession in question took place only after respondent was in default for a period of approximately eight months. During this time he had made numerous promises to pay, none of which materialized. Moore had repeatedly contacted Peterson in his attempt to bring the contracts current. After these efforts proved fruitless, Peterson was duly notified that the combine and tractor would be repossessed if payment was not forthcoming. Such conduct can hardly be termed an extreme deviation from reasonable standards of conduct. The award of punitive damages must be set aside.

### III

■ Massey-Ferguson also maintains that the trial court erred in denying its claim for a deficiency judgment. Massey-Ferguson argues that it is entitled to a deficiency judgment for $3,488.39, the difference between the proceeds of the resale (less *reconditioning, repossession and resale* costs) and the amount of the outstanding debt. *See* I.C. § 28–9–504(1). As previously mentioned, the trial court found that Massey-Ferguson had completed the resale of some of the equipment prior to August 28. Massey-Ferguson had previously notified Peterson that he would have until that time to redeem the collateral. *See* I.C. §§ 28–9–504(3) and 28–9–506. Massey-Ferguson disputed the allegation that it had

sold the equipment prematurely. However, we have reviewed the record and find that there exists sufficient, albeit conflicting, evidence to support the trial court's finding that some of the collateral had been sold early. This finding of fact is not "clearly erroneous" and will be sustained on appeal. I.R.C.P. 52(a).

The trial court concluded that the premature resale was a "commercially unreasonable" act. On the basis of that conclusion, the court denied Massey-Ferguson's claim for a deficiency. This conclusion was in error.

Under the Uniform Commercial Code, a creditor must meet two requirements in reselling repossessed collateral. I.C. § 28–9–504(3). First, he must give the debtor and other interested persons reasonable notification of the sale. In the case of a public sale, the creditor must give notice of the time and place of the sale. In the case of a private sale, such as here, the creditor need only notify the debtor of the time after which the sale or other intended disposition is to take place. Secondly, "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." *Id.*

We have recently considered the legal ramifications of a creditor's failure to comply with U.C.C. requirements governing the resale of collateral. *Mack Financial Corp. v. Scott,* 100 Idaho 889, 606 P.2d 993 (1980). In *Mack,* we expressly rejected the approach apparently taken by the trial court in the instant case. We held that a creditor's failure to comply with the requirements governing disposition of repossessed collateral does *not* absolutely bar the creditor's right to a deficiency judgment. Instead we adopted the following approach:

"[W]here the requirements in I.C. § 28–9–504(3) are not met by a secured party, it will be presumed that the fair market value of the collateral at the time of repossession was equal to the outstanding debt and that the debtor owes no deficiency. The secured party will then have to carry the burden of proving the actual fair market value of the collateral at the

time of repossession in order to establish its right to a deficiency judgment." *Id.* at 892, 606 P.2d at 966.

While we affirm the trial court's finding that Massey-Ferguson's premature resale of the collateral violated the requirements of I.C. § 28–9–504(3), we disagree with the remedy imposed. Although considerable evidence was introduced on the issue, the court below issued no findings with respect to the fair market value of the collateral in question. On remand, the trial court must address this issue. Massey-Ferguson must then shoulder the burden of proving its entitlement to a deficiency judgment by demonstrating that the fair market value of the collateral sold was less than the outstanding debt plus costs of repossessing, reconditioning and resale.[5] *Mack Financial Corp. v. Scott, supra.*

### IV

Finally, Massey-Ferguson takes issue with the trial court's award of $13,677.50 in attorney fees pursuant to I.C. § 12–121.[6] It argues that the amount is excessive and unjustified, and was awarded without proper consideration of the factors set forth by this Court in *Smith v. Great Basin Grain Co.,* 98 Idaho 266, 561 P.2d 1299 (1977). Because of our disposition of this case, we need not specifically review the trial court's award of attorney fees. Several matters should be mentioned, however.

█ The decision of this Court has altered the status of the parties. While we reduced the award of damages, Peterson is still entitled to nominal damages on his counterclaim. With respect to Massey-Ferguson's claim for a deficiency judgment, there is at this juncture no prevailing party, since the trial court must reexamine this issue upon remand. These factors alter substantially the entitlement to attorney fees under I.C. § 12–121. Where parties have each prevailed on different causes of action tried in the same lawsuit, attorney fees may be apportioned accordingly. *See Jensen v. Shank,* 99 Idaho 565, 585 P.2d 1276 (1978). *Cf.* I.R.C.P. 54(d)(1)(B) (permits trial court to apportion costs where party prevails in part). We therefore set aside the trial court's award of attorney fees. On remand, the trial court should re-evaluate the matter of attorney fees after this controversy is ultimately resolved.

To summarize, the trial court's award of both actual and punitive damages is hereby reversed, with instructions to enter judgment for nominal damages on behalf of counterclaimant Peterson; the trial court's denial of Massey-Ferguson's claim for a deficiency judgment is hereby reversed and remanded for proceedings consistent with this opinion; and the trial court's award of attorney fees is similarly reversed and remanded for reconsideration.

Costs to appellant. No attorney fees on appeal.

DONALDSON, C. J., McFADDEN, J., and BEEBE, J. pro tem., concur.

---

5. At the trial, Peterson moved to dismiss Massey-Ferguson's claim for a deficiency on the grounds that Zitlau Motors, and not Massey-Ferguson, was the real party in interest. *See* I.R.C.P. 17(a). Apparently, there was evidence to the effect that Massey-Ferguson Credit Corporation had charged back the loss from the deficiency to Zitlau Motors' open account. The trial judge did not resolve this issue, which was rendered moot by his denial of any claim for a deficiency. On remand, the trial court may find it necessary to address this issue in conjunction with the merits of the deficiency claim.

Peterson also alleged, and the trial court found, that Massey-Ferguson leased one of the combines prior to its ultimate resale. Under I.C. § 28–9–504(1), proceeds of a lease constitute "proceeds of disposition" which must be credited to the debtor and which therefore would decrease the creditor's deficiency, if any exists, or increase the debtor's surplus, if any exists. The trial court, on remand, must also consider this factor in its calculations.

6. Judgment in this case was entered prior to this Court's adoption of I.R.C.P. 54(e), effective March 1, 1979, which now governs the award of attorney fees made pursuant to I.C. § 12–121.

BISTLINE, Justice, dissenting.

## I.

*Yacht Club Sales and Service, Inc. v. The Idaho First National Bank of North Idaho,* 101 Idaho 852, 623 P.2d 464 (1980), was the third in a string of three 1980 opinions which reversed district court judgments awarding punitive damages. These three cases emanated from the First Judicial District in contested trials which were presided over by three of Idaho's outstanding district judges—with distinguished service both on the district bench and this bench totalling forty-seven years. *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980), rehearing denied without opinion March 17, 1980, too, was a jury case where the trial court, as in *Yacht Club,* reviewed the record on a motion for new trial and, finding no error, upheld the jury verdict. *Linscott v. Rainier National Life Insurance Company,* 100 Idaho 854, 606 P.2d 958 (1980), rehearing denied without opinion March 17, 1980, was as here, tried to the court without a jury.

With considerable care I attempted to demonstrate in *Yacht Club* that there was no justification whatever for reversing. In my opinion the same holds true for *Hatfield* and *Linscott,* although there being in each but the one opinion to which resort may be had, other than what I see to be a lack of logic and the misapplication of law appearing on the face of those opinions, the truly interested reader will have to ascertain from his own reading of the record what those cases, and this one, stand for—other than a predisposition to abrogate the punitive damage body of law which has existed

in Idaho for years, a body of law more needed for public protection than ever before.

In *Yacht Club* I mentioned that this abrupt change in the law had its genesis in *Cox v. Stolworthy,* 94 Idaho 683, 496 P.2d 682 (1972). The author of that opinion was also the author of *Yacht Club, Hatfield,* and *Linscott.* Unlike the process for promulgation of rules of procedure, where committees of attorneys participate in discussion and drafting, *Cox v. Stolworthy's* drastic change in the law was made with absolutely no input whatever from the litigants there involved, from the bar, or from the public. There was no clamor for the Court's activism.[1] The appellant in *Cox v. Stolworthy,* 94 Idaho 683, 496 P.2d 682 (1972), complained only that the district judge there had affirmed a jury verdict which imposed $5,000 punitive damages for the willful and malicious bulldozing out of a private access roadway. Issuing a lengthy opinion which completely rewrote the law of punitive damages, the Court lowered the assessment, but failed to explain how its $2,000 figure was more appropriate than the $5,000 damages assessed by the jury and upheld by the trial court. It was a little case. But as Chief Justice Burger remarked in addressing the American Law Institute in Washington, D. C., June 10, 1980, "[c]hanges in the law come silently, and, like a glacier, the movement is almost imperceptible, often first emerging in an obscure case that goes unnoticed."

*Cox v. Stolworthy,* however, was not destined to go long unnoticed, even though it was an obscure case. *Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939 (1972), was released but seven days after the release of

---

1. As was noted in the opinion:

"There is no attack made in the present appeal on the exemplary damages principle and as previously discussed we uphold the submission to the jury of the exemplary damages issue. Our review of the precedents in this area has revealed conflicting standards, and thus we conclude the objective standards by which courts determine what is a reasonable

amount of exemplary damages in a case such as this should be more precisely defined.

"In setting about this task, we keep in mind two factors. First, in fashioning useful, workable legal rules a court must clearly define the social purpose or social utility the rules are to serve. Second, the rules ought to fix objective factors which can be logically ordered, legally evaluated, and rationally judged to arrive at a result which is both predictable and consistent

*Cox v. Stolworthy,*[2] in point of time considerably before the remittitur had gone down in the latter.

In *Jolley v. Puregro* another able trial judge assessed $5,000 as punitive damages for the conversion of farm equipment. The trial court's findings of malicious conduct were in the Court's opinion upheld. That should have been the end of it, but it was not. Notwithstanding that nothing more needed to be said in affirming $5,000 punitive damages, the opinion seized upon the occasion to redecide (and affirm) the punitive damages, doing so on the basis of *Cox v. Stolworthy,* rather than on the basis that the assessment was not excessive for the type of conduct there involved. *Jolley v. Puregro,* another obscure case, is noteworthy only in that it served as a vehicle to endorse the new views just then espoused in *Cox v. Stolworthy.*

This precipitate endorsement may have been an attempt to mollify the views of Chief Justice McQuade who, in dissent in *Cox v. Stolworthy,* expressed his apprehension that "under the majority opinion, reasonable attorney's fees and related expenses do not function merely to *limit* exemplary damages awarded on other punitive grounds; rather, they *are* what the majority terms 'exemplary damages.'" 94 Idaho at 692, 496 P.2d at 691. (How true, how true.)

As mentioned above, although the Court did not in *Jolley v. Puregro* reduce the award of punitive damages which Judge

Dunlap had properly fixed as appropriate, the Court, without any evidence upon which to act, apparently pulled out of a hat the sum of $2,500 as attorney fees[3] and allocated the other $2,500 as the not unreasonable deterrent for the defendant corporation's taking ways. This, it was said, was permissible as being "under the general rule in *Cox v. Stolworthy.*" The defendant, however, knew only that the exemplary damages of $5,000 remained.

What was accomplished in those cases did change the law. At any time three members of the Court reach a determination to change the case law, nullify a statute, or promulgate a new rule, it is simply accomplished merely by doing it, and the trial bench and the bar are bound by it. That is not to say that such is a sound philosophy absent a compelling need and sound reasoning.

In *Hatfield, Linscott* and *Yacht Club,* three most able trial judges held punitive damages allowable, believing that they were acting within the Court's "general rule of *Cox v. Stolworthy.*"[4] A review of those cases will demonstrate that those trial judges were entirely correct. In *Yacht Club,* it is true that the award of punitive damages did not come under the Court's direct assault, but rather a majority of the Court found error in the award of the underlying compensatory damages, the opinion of two members of the Court being that no error existed. In that case the Court's opinion made no response to my pointing

---

in similar situations." *Cox v. Stolworthy,* 94 Idaho at 689, 496 P.2d at 688.

2. Judges on the trial bench and attorneys with more than occasional experience in appellate practice will realize that opinions still subject to being withdrawn or modified on petition for rehearing *are not resorted to as authority.* Both of these cases were in the Court's "hopper" at the same time.

3. Justice McQuade quite correctly challenged the right of a court to impose attorney fees in the absence of legislative authority. His admonition went unheeded. *See also Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 919–22, 591 P.2d 1078, 1086–89 (1979) (Bistline, J., concurring specially).

4. The "Blue Ribbon" Idaho Pattern Jury Instruction Committee saw *Cox v. Stolworthy* primarily as guidelines by which trial courts could review jury verdicts setting punitive damages, as is evidenced by its comment to IJI 919:

"The committee takes the position that the material in *Cox v. Stolworthy,* 94 Idaho 693, 496 P.2d 682, and *Jolley v. Puregro Co.,* 94 Idaho 702, 496 P.2d 939, is not appropriate for instructing the jury but rather bears on the criteria to be applied by the trial judge in determining whether to submit an issue of punitive damages to the jury and whether, if the issue is submitted to the jury, to sustain an exemplary damage award upon a proper post-trial motion."

out that the Court in *Jolley v. Puregro* had sustained the $5,000 punitive damages award, although the compensatory damages were but $150. In *Yacht Club* I voiced the fear that the bar might conclude that the decision in that case was result-oriented, aimed at indirectly disallowing punitive damages, but at the same time paying lip service to the proposition that such are still allowable. Today, I am beset by the same apprehension. Punitive damages may be alive, but they are not well.

## II.

Here another able trial judge has *within the narrow confines of Cox v. Stolworthy* awarded *modest* punitive damages. Again the trial court is reversed with the punitive damages again falling along with the reversal of the general damage award. The main premise of the Court's opinion, as I see it, is that the trial court failed to perceive that Massey-Ferguson Finance Co. at all times had the right to possession of the collateral upon default, and therefore could do no legal wrong in breaking the lock and helping itself to collateral the title to which was in Peterson, even trespassing to do so. It is said that the U.C.C. makes such conduct permissible. Under that theory one would have to believe that any creditor who can *later* prove that another has possession of the creditor's property cannot be held accountable for his conduct in breaking into his debtor's home, and seizing the particular property which he later may prove was his. Self help in proper circumstances is commendable, but in other instances anarchy.

Under our system of jurisprudence, the issues in this case were submitted to a trial judge for resolution. In the absence of established error on his part, his decision should be affirmed. It ought not be reversed simply where the members of an appellate court differ as to the trial court's view of the conduct in question. The U.C.C. does say that a creditor is entitled to the collateral on the debtor's default, but it does not purport to say that the creditor may in any event simply help himself. Quite the contrary. The U.C.C. does not,

nor should it, allow a creditor to engage in conduct which is a breach of the peace, or which is likely and highly probable to lead to a breach. The view espoused in the Court's opinion will allow a creditor, aided and abetted by hoodlums, by such great show of force, to take possession of collateral without there being an actual affray—simply because a prudent debtor, his wife, relatives and friends would be afraid to interfere. My colleagues need to entertain a more enlightened view as to the meaning of *breach* of the peace. The conduct of the defendant here was such that the trial court found it offensive to our societal views, and that view should be respected.

## III.

As with anyone else, I am bound to accept that which unfortunately was done in *Cox v. Stolworthy*. I am, however, at liberty to, nay, even obliged to, and do, question its validity and its doubtful origin. That case, as endorsed in *Jolley v. Puregro*, was an unsolicited rewriting of the law which hopefully will soon be overruled by the Court or by the legislature. As of now those cases and their recently spawned progeny represent an almost complete fulfillment of a philosophy which will, if it has not already done so, severely curtail or extinguish punitive damage awards in Idaho, and with it falls a history replete with judicial policing of oppressive, harassing, malicious—but not necessarily criminal—conduct.

While many practitioners have deplored the promiscuity with which the Court deals out rules, and amendments to rules, the Court nonetheless has the right, agreed to by the legislature, to make the procedural rules by which a controversy finds its way into and progresses through and out of the system. I fear that that disenchantment will be manifold where the Court—entirely *absent the input from the trial bench and bar which goes into most of the rules*—sua sponte changes the law on its own motion and notion as to what is for the betterment of the people of the state.

If the Court were to look back on the law of punitive damages as it was, where trial courts and this Court *occasionally* modified an award as excessive, and compared those days with events of the recent year, I suspect the Court would well wonder at the havoc its unsettling of the law of punitive damages has visited upon the administration of justice in Idaho. Nor should one forget that it is the legislature, not the court, which can authorize recovery of attorney fees. Since *Cox v. Stolworthy* the legislature has done so—making even less tenable the reasoning of the Court for tasting of that particular forbidden fruit.

Finally, it seems appropriate to conclude this effort with a well-reasoned discussion of the law of punitive damages as we formerly knew it, authored by the trial judge in *Cox v. Stolworthy*, whose legal ability and acumen are as well known and respected as that of any other judge or justice in our system.

"The Court has reviewed the decisions of the Supreme Court of Idaho bearing on the question of excessive awards by juries cited by counsel, and many more that have come to the attention of the Court. In Idaho, if an excessive verdict of a jury is a result of passion and prejudice, or other irregularity, a new trial should be granted. If an excessive verdict does not have as a base evidence sufficient to justify the same, then a remittitur can be granted, with a new trial in the event the prevailing party does not accept the remittitur.

"Courts in some jurisdictions do not tamper with jury findings unless there is passion or prejudice or other irregularity which can be said to have been violative of a right to a trial by jury. In Idaho in exercising the device of finding that there is not substantial evidence to justify a jury award, or in presuming passion or prejudice simply from the amount of the award, the Court must make certain it is not, in reality, merely substituting its own opinion for that of the jury. The difference can often be a very fine line.

"In many of the older cases, the courts justified reduction of jury awards by re-lying on comparisons of actions taken in other courts (See: *Summerfield v. Pringle*, 65 Idaho 300, at 315-6 [144 P.2d 214]), and without comparison beyond the proposition that the same general category of wrong was involved. Comment on the relative value of this device in more recent cases appear in *Mendenhall v. MacGregor Triangle Company*, 83 Idaho 145, at 150 [358 P.2d 860], and *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, at 908 [453 P.2d 551].

"The device in punitive damage cases of looking to the ratio of actual damages awarded for the act to punitive damages likewise awarded as a major or principal guideline has been somewhat eroded, as declared in *Boise Dodge*, and the import of the overall circumstances of the case involved is emphasized.

"The jury in this cause viewed the conduct of the defendant to have been wilful and malicious, or grossly negligent and outrageous. There is substantial evidence to support these findings. A trier of the fact in this case might well have viewed the defendant's conduct as being 'not too serious' and felt that a lesser sum would deter and punish the defendant. The 12 jurors, unanimous in their findings, may well have viewed the defendant as a man of large holdings in the area, knowing he had no right to enter upon the plaintiffs' leasehold, and who, in spite of that knowledge, literally bulldozed himself a way across plaintiffs' lands.

"The destruction of a portion of the fencing in the process and the absence of any effort to repair the same could have been considered as indicative of the attitude of the defendant. The fact that plaintiff and defendant are neighbors, and likely will be neighbors for some time, could have been considered by the jury as one reason why some deterrent award was necessary.

"The Court is of the opinion that there is substantial evidence to support the punitive damage award, and that the same is not so excessive as to give rise to any presumption that it resulted from passion

and prejudice, and, there appearing no other irregularity to indicate to the Court that the matter was not fairly presented to the jury, the Motion will be denied." There simply was no reason for this Court to attempt an improvement on that evaluation of the then existing sound and well respected law.