793 P.2d 222

COMSTOCK INVESTMENT CORPORA-
TION, a Washington corporation,
Plaintiff–Respondent,

v.

KANIKSU RESORT, Howard H. Gatlin and Jane Doe Gatlin, husband and wife, John Doe Peterson and Jane Doe Peterson, husband and wife, Defendants–Appellants.

No. 17245.

Court of Appeals of Idaho.

May 2, 1990.

Thomas E. Cooke, Cooke, Lamanna, Smith & Cogswell, Priest River, for defendants-appellants.

James H. Paulsen, Sandpoint, for plaintiff-respondent.

## SUBSTITUTE OPINION

The Court's prior opinion, dated September 11, 1989, is hereby withdrawn.

BURNETT, Judge.

This appeal arises from a sale of personal property to satisfy a lien for services under I.C. § 45–805. The statute provides that a lienholder must pay the property owner any difference between the "proceeds of the sale" and the debt (including costs) secured by the lien. In this case, however, the district court has entered a judgment requiring the lienholder to pay a difference based not upon the "proceeds of the sale" but upon the full market value of the property. For reasons explained below, we vacate the judgment and remand the case.

### I

The facts are complex. We state them essentially as the district court found them. For several years, Comstock Investment Corporation moored a boat at a marina operated by the Kaniksu Resort. As a bailee, Kaniksu charged the boat owner $200 per year for moorage services. In 1975, some equipment on the boat was discovered to be missing. The bailee acknowledged responsibility for the equipment. The parties did not reach a monetary settle-

ment, nor did they agree on a credit or offset against moorage services. Rather, the boat owner and the bailee's marina manager informally agreed, in the district court's words, that "no more storage charges would be made for the [boat] until the equipment was replaced or returned." The parties did not specify how long this arrangement would last if the equipment was not found. The boat remained at the marina. The equipment never was located.

On December 8, 1978, after management at the marina had changed hands, the bailee sent the boat owner a bill for charges accruing since 1975. The boat owner did not respond. On February 12, 1979, the bailee sent the boat owner a letter requesting payment on the bill. The boat owner did not respond. On March 29, 1979, the bailee sent the boat owner a certified letter, with return receipt requested, stating that the boat would be advertised for sale and that the proceeds would be applied to storage charges. The return receipt showed that the letter was received no later than April 11, 1979. The boat owner still did not respond. On April 17, 1979, the bailee placed the following notice in "The Sandpoint Bee," a newspaper published in Bonner County, where the boat was moored:

### NOTICE OF PUBLIC SALE

Pursuant to the provisions of Idaho Code 45805, KANIKSU RESORT at Priest Lake, Idaho, will on the 28th day of April, 1979, at the hour of 6:00 p.m., sell at public auction, to the highest bidder for cash, the following described personal property:

1 Model LD Houseboat, Serial No. 623–2982, blue and white in color, manufactured by Teria Marina Company, Houston, Texas, with 40 h.p. motor.

Said personal property will be sold pursuant to said statute in satisfaction of unpaid storage charges of $1,016.68 plus interest accrued since January 1, 1979, plus costs of sale.

KANIKSU RESORT
By: –s– Thomas E. Cooke
Thomas E. Cooke,
Its Attorney

A sale was conducted on April 28, 1979, as advertised. No representative of the boat owner appeared. A principal in the bailee's business purchased the boat with a bid of $1,208.46—an amount the bailee claimed for storage charges plus sale costs.

*After* the sale, the boat owner sent the bailee a letter containing the following statement:

I do not understand your letter of March 29th. It is my understanding ... that the boat is at the resort under an agreement with the past manager. That such agreement was one wherein you exchanged unimproved and unmaintained mooring privileges in exchange for the use by your employees of various items of equipment of Comstock.

.      .      .      .      .

Such agreement has been in effect on an annual basis currently expiring on July 1 this year.

Although this letter carried a date of April 27, 1979, it was not actually postmarked until May 7, 1979. In June, 1979, a representative of the boat owner came to the marina, inquired about the boat, and was informed that it had been sold. The boat owner then sued, alleging that the bailee had committed a tortious conversion of the boat. The bailee answered that it simply had foreclosed a lien for services in accord with I.C. § 45–805.

The case languished in court for several years, finally being tried after the judge issued a notice of proposed dismissal. Following a bench trial, the judge determined that the informal agreement to suspend storage charges had been limited to a "reasonable" period of one year. He further determined that since the missing equipment had not been replaced or returned during that time, the agreement was in breach—obligating the bailee to pay for the equipment. The judge found the equipment to be worth $800.00. The judge also determined that the bailee was entitled to collect unpaid and prorated charges for

moorage services. The judge fixed the proper charges at $716.69, rather than $1,016.68 as the bailee had claimed.[1] The judge also awarded the bailee $191.78 in sale costs, bringing its total recovery on the lien to $908.47. The judge specifically rejected the boat owner's contention that it did not owe any debt to the bailee. The judge held that "the parties had mutual debts against each other."

The judge then made an additional ruling that precipitated this appeal. Finding the fair market value of the boat to be $3,000.00, he ordered the bailee to pay the boat owner the difference between this sum and the lien recovery of $908.47, thereby compelling the bailee to pay $2,091.53 in addition to $800.00 for the missing equipment. The judge did not predicate this ruling upon any finding of an invalid sale, upon a tortious conversion or upon any other improper conduct by the bailee. To the contrary, the judge's only reference to improper conduct was directed at the boat owner. He said the owner should be "estopped to complain about the conduct of the foreclosure sale" because it had "fail[ed] to reasonably and timely respond to the billings and letters of the [bailee]."

From the bailee's perspective, however, the court's judgment was the equivalent of a damage award for a tortious conversion. The bailee was forced, in effect, to buy the boat at full market value in order to satisfy its lien under I.C. § 45–805. This appeal followed.

## II

The boat owner now appears to concede that I.C. § 45–805 contains no requirement that a lienholder make a payment based on the property's full market value. The statute allows a lienholder to conduct a sale, at which it may bid the amount claimed for services rendered, plus sale costs. If the property is sold for a sum greater than the debt (including costs) secured by the lien, the lienholder must tender the excess proceeds to the property owner.[2]

Despite this clear statutory scheme, the boat owner argues that the district court was right in ordering the bailee to pay the difference between its lien recovery and the property's full market value. The owner's argument is three-pronged: (a) that there really was a tortious conversion, notwithstanding the judge's failure to so hold; (b) that I.C. § 45–805 is unconstitutional, nullifying any sale conducted under its provisions; and (c) that even if the boat sale was authorized by a valid statute, it was not conducted in a commercially reasonable manner. We will address these points in turn.

## A

The boat owner contends that there was a tortious conversion. The theory underlying this contention is that the boat owner owed no debt to the bailee. If no debt existed, the theory goes, there was no lien; if there was no lien, the sale was not authorized by I.C. § 45–805; and if the sale was not authorized by the statute, then it was a

1. The bailee mistakenly had included a charge for another boat in its calculation of the amount owed. No charge was due on the other boat. In any event, no attempt was made to sell the other boat; rather, the boat in question here simply was sold for more than the amount actually secured by the bailee's lien. As we explain in today's opinion, the boat owner is entitled to receive the excess proceeds of the sale. The bailee's miscalculation of the amount owed does not affect the validity of its lien for the correct amount. *See, e.g., Guyman v. Anderson,* 75 Idaho 294, 271 P.2d 1020 (1954).

2. At common law, a bailee's lien was possessory only. Under I.C. § 45–805, a lienholder is entitled to possession *and* sale. The statute gives these rights to any person, such as a bailee, who performs services in relation to personal property. It provides in pertinent part as follows:

> If the liens as herein provided are not paid ... the person in whose favor such special lien is created may proceed to sell the property at public auction.... The proceeds of the sale must be applied to the discharge of the lien and costs; the remainder, if any, must be paid over to the owner.

After this lawsuit was filed, I.C. § 45–805 was amended. The present version of the statute combines the foregoing provisions with verbiage relating to care, boarding and feeding of livestock. 1982 Idaho Sess.Laws, ch. 262, § 1, p. 673. The result is a confusing alchemy of language, but it does not affect the case now before us.

tortious conversion. Like any theory, of course, this theory is no better than the premise from which it starts. The premise that no debt existed is factually flawed. The district court specifically found, as we have noted, that the parties owed "mutual debts"—the bailee for the missing equipment, and the boat owner for moorage services. But the boat owner's position is not grounded in fact. Rather, it is based on an assertion—that no legally cognizable debt ever existed because the storage charges eventually allowed by the court ($716.69) turned out to be less than the equipment value ultimately fixed by the court ($800.00), thereby creating a complete offset.

This approach, too, is flawed. It confuses a potential offset at the time of a lien sale with an offset subsequently asserted and adjudicated during a post-sale lawsuit. The two are not the same. Unlike an adjudicated offset, a potential offset may not be fully known to the lienholder or it may not be timely asserted by the debtor. Even when a potential offset is eventually asserted, it may fail on its merits or it may be adjudicated at a lesser sum than the debt owed to the lienholder. In this case, for example, the boat owner did not question the existence of a moorage debt until the sale had occurred. No offset was asserted until this lawsuit was filed. Even then, it was not until the judge ultimately quantified the equipment value and the allowable moorage charges that a complete offset was established.

■ It is true, of course, that a lien cannot exist without an underlying debt. However, the mere existence of a *potential* offset does not *automatically* extinguish the debt and cancel an otherwise valid lien. The lien is valid, and can be exercised lawfully, until the debt is extinguished by payment or tender. *See* RESTATEMENT OF SECURITY § 78 (1941). Alternatively, § 79 of the Restatement provides that the lien may be terminated by judicial determination of an offset:

(1) Where a possessory lienor is liable to the bailor for harm to or conversion of the chattel upon which a lien exists, the amount for which the lien is security is *not automatically* reduced except in the case of the common carrier, but the bailor can set off in an action on the debt by the lienor, any claim he may have against the lienor arising out of the lienor's conduct in respect of the chattel. [Emphasis added.]

The Restatement approach relieves a lienholder (other than a common carrier) of the risk that exercising its lien—even by simply retaining possession under a common law lien—might be deemed a tortious conversion if an offset were determined *later* to exceed the debt. The Restatement encourages timely assertion of offsets against lienholders, and it recognizes that debts and offsets may be determined in the same judicial proceeding under modern court rules.

■ This approach also commends itself to us as a matter of policy. It would be palpably unfair, and would undermine the remedial purpose of lien statutes such as I.C. § 45–805, if a debtor could stand silent, allowing a sale to occur without objection, and then obtain tort damages in a subsequent lawsuit if the debt were ultimately found to have an offset. The law does not, and should not, countenance such a retroactive tort.

In advancing its tort theory, the boat owner has invited our attention to *Dawson v. Eldredge*, 89 Idaho 402, 405 P.2d 754 (1965). In *Dawson*, a materialman sought judicial foreclosure of a lien under I.C. § 45–501. Foreclosure was denied when the trial court found that the debt owed the materialman was subject to a complete offset in favor of the property owner. A claim for attorney fees under the lien statute was denied for the same reason. The Supreme Court ultimately affirmed, holding that lien remedies were unavailable in light of the adjudicated offset. This holding, with which we have no quarrel, is inapposite to the instant case. The issue presented here, and not in *Dawson*, is one of retroactivity. The offset in this case was not asserted, much less adjudicated, until a lien sale had occurred under I.C. § 45–805. In *Dawson* the offset was as-

serted and adjudicated before any sale. Therefore, nothing in *Dawson* supports the boat owner's theory of a retroactive tort in this case.[3]

Neither is this case similar to *Gunnell v. Largilliere Co.*, 46 Idaho 551, 269 P. 412 (1928). There, our Supreme Court upheld an award of tort damages for improper sale of property under a chattel mortgage. The Court held that the mortgagee had no right to sell because the underlying loan was not in default. The case presented no issue of an offset; *a fortiori*, it presented no issue of a retroactive tort based upon adjudication of an offset after a lien sale. *Gunnell* is not apposite here.

We conclude that the bailee in this case did not commit a tort by collecting its debt in the manner provided by I.C. § 45–805. The boat owner, having been notified of the debt and of an impending sale, could have asserted its offset before the sale occurred. Instead, it elected to remain silent. In this circumstance, the sale of the boat cannot be deemed a conversion.[4]

## B

We next address the constitutionality of I.C. § 45–805. The boat owner contends that the statute is infirm because it authorizes a sale without expressly requiring "actual" notice to the property owner, or a judicial hearing. The version of the statute applicable here simply requires that a notice of sale be published in a newspaper in the county where the property is located. This was done. The boat owner argues that such notice is inadequate—that it denies procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

The argument is not persuasive, legally or factually. From a legal standpoint, it runs afoul of the axiom that a due process issue must be framed by state action. The lien sale procedure authorized by I.C. § 45–805 is a self-help remedy. The

---

3. We further note that *Dawson* cited I.C. § 5–615, which then provided as follows:

> When cross demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim could have been set up, *the two demands shall be deemed compensated,* so far as they equal each other.... [Emphasis added.]

The *Dawson* court thereby underscored the importance of adjudicated offsets. The phrase "deemed compensated" was never intended to countenance the retroactive destruction of a lien after foreclosure.

Today, I.C. § 5–615 has been repealed and replaced by court rules. Idaho Rules of Civil Procedure 13(a), 13(g) and 54(b) provide that any conflicting demands presented to a court are resolved in a single judgment. This efficient procedure carries no implication that the adjudication retroactively destroys a prior lien, changing an otherwise valid prelitigation sale into a tortious conversion.

4. In his dissenting opinion, Judge Swanstrom apparently draws no distinction between a potential offset and an adjudicated offset. For that reason he perceives no difficulty in giving retroactive effect to the adjudicated offset in this case, thereby "eliminating" the moorage debt and invalidating the lien after the sale. With all due respect to our colleague, we think such after-the-fact destruction of liens is unsound in policy and is an evil which the Restatement was designed to prevent.

The dissenting opinion also suggests that no debt existed because the bailee, having breached an obligation to return or replace the missing equipment within a year, had no right at any time thereafter to demand payment of moorage charges. The district court obviously did not ascribe to this view. In any event, the dissent confuses a possible *defense* to collection of a debt with existence of the debt itself. Here, the debt arose from continued mooring of the boat at the marina. The bailee's right to collect that debt by a lien sale might have been subject to a timely challenge, but in fact it was not challenged until the sale had occurred.

Finally, the dissenting opinion contends that the district court's judgment, forcing the bailee to pay a sum based on the boat's full market value, represents an "equitable result" in the case. The district court did not invoke equity to reach its result. Indeed, the court's only mention of an equitable principle was the statement, noted above, that the boat owner should be estopped to complain about conduct of the lien sale because it disregarded prior communications from the bailee about the moorage charges. But even if equitable arguments could be made for and against both parties, we must recognize that equity does not have free rein here. This is a statutory lien case. The rights of the lienholder are legislatively prescribed. It would be inappropriate for us to obscure the statute's application in this case, and perhaps to impair its application in future cases, by searching for an equitable rationale to achieve a particular result.

United States Supreme Court has held, in *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), that the self-help provision of a statute creating a warehouseman's lien does not constitute state action. Similarly, the Idaho Supreme Court has determined in *Massey–Ferguson Credit Corp. v. Peterson*, 102 Idaho 111, 626 P.2d 767 (1980), that self-help repossession under Article 9 of the Uniform Commercial Code does not constitute state action invoking the Fourteenth Amendment. We find these cases to be controlling.

■ The factual weakness in the boat owner's argument is that the published notice was not the owner's sole source of information about a sale. As noted previously, the bailee billed the owner, wrote to the owner about the bill, and then sent the owner a certified letter specifically warning that the boat would be "advertise[d] for sale" to collect storage charges. Although the letter did not specify a date of sale, as did the published notice, the letter clearly was "enough to excite the attention of a man of ordinary prudence and prompt him to further inquiry...." *Farrell v. Brown*, 111 Idaho 1027, 1033, 729 P.2d 1090, 1096 (Ct.App.1986) (discussing adequacy of pleaded notice of claim to land, and quoting *Hill v. Federal Land Bank*, 59 Idaho 136, 141, 80 P.2d 789, 791 (1938)).[5]

Thus, in this case, the property owner has demonstrated no actual prejudice flowing from any perceived inadequacy in the notice mandated by I.C. § 45–805. Unless an individual has been adversely affected by a statute, he or she "will not be heard to argue that [the] statute is constitutionally deficient because it lacks due process guarantees." *Pine Creek Ranches, Inc. v. Higley*, 101 Idaho 326, 327, 612 P.2d 1173, 1174 (1980).

## C

■ Finally, we consider the boat owner's argument that I.C. § 45–805 should be construed, by analogy to Article 9 of the Uniform Commercial Code, as requiring a lienholder to conduct a "commercially reasonable" sale. The boat owner asserts that the bailee in this case acted unreasonably by advertising the sale only in a local newspaper. In addition, the owner would have us go a step beyond the Uniform Commercial Code by holding that a commercially unreasonable sale will be treated as though it were a sale at the property's entire market value, as ultimately determined by a court, thereby obligating the lien creditor to pay the owner the difference between this postulated market value and the debt (including sale expenses). In contrast, Article 9 simply precludes recovery of a deficiency judgment if a sale is found to be commercially unreasonable. *See Mack Financial Corp. v. Scott*, 100 Idaho 889, 606 P.2d 993 (1980).

We decline the boat owner's invitation to adopt Article 9 by analogy, to enlarge upon its remedies, and to engraft the enlarged remedies upon I.C. § 45–805. Liens for services relating to property have a long history in Idaho. Idaho Code § 45–805 applies to a wide range of service providers, ranging from sophisticated businesses to shoe repair shops and laundries. The Idaho Legislature has not seen fit to impose upon such service providers the same burdens Article 9 places on secured parties under the Uniform Commercial Code. Neither has the Legislature determined that service providers must, in effect, sell (or buy) property at full market value in order to collect the debts owed to them. We leave these policy decisions to the Legislature. We decline to make them by judicial fiat.

■ In summary, we vacate the district court's judgment, which in effect compelled the bailee to purchase the boat at full market value in order to collect a moorage debt. This case is remanded for entry of

---

**5.** The dissenting opinion correctly observes that the boat owner had two boats moored at the bailee's marina, and that the letter warning of a sale did not describe a particular boat. However, it does not appear that the owner has claimed confusion on this point as a reason for failing to respond to the letter. (As noted above, the boat was fully described in the notice subsequently published.)

an amended judgment awarding the boat owner the value of the missing equipment, together with the difference between the actual proceeds of the sale and the amount eventually allowed by the district court as moorage charges and sale costs. The amended judgment will bear interest from the date of the original judgment. *See Dursteler v. Dursteler*, 112 Idaho 594, 733 P.2d 815 (Ct.App.1987). Costs (exclusive of attorney fees, which have not been requested) are awarded to the appellant, Kaniksu Resort.

SMITH, J. Pro Tem., concurs.

SWANSTROM, Judge, dissenting.

I dissent because I believe the judgment is legally sound and should be affirmed.

The district court found that the boat owner had paid all moorage fees due the bailee to September 1, 1975. About that time the owner learned that certain boat equipment was missing from storage. Apparently, employees of Kaniksu Resort had used the equipment without the owner's knowledge or permission. The owner and the bailee agreed, orally, that "no more storage charges would be made for the houseboat until the equipment was replaced or returned" by the bailee. Although the parties placed no time limit on performance, the district court later found that one year "would certainly be an adequate and reasonable time" for the bailee to return or replace the equipment. The bailee never replaced or returned the equipment its employees had borrowed. Therefore, as the district court found, the agreement was "in a state of breach" after one year.

Moreover, the breach of the agreement by the bailee was material. As the court later found, the missing equipment was worth $800, four times the annual moorage fees. When the breach occurred, around September 1, 1976, the owner owed nothing for storage charges and, obviously, the bailee had no lien to foreclose.

Clearly, the oral agreement altered the lien rights of the bailee marina. Under I.C. § 45–805 a caretaker of property "has a special lien ... for the compensation, if

any, *which is due him* from the owner, for such [safekeeping] service." (Emphasis added.) Significantly, for more than three years after the oral agreement was made, the bailee gave no notice to the boat owner that any moorage fees were payable. The district court noted that billing of the boat owner was renewed only after new managers—who had no knowledge of the oral agreement—took over management of the marina.

The lead opinion does not say *when* the compensation became due from the boat owner to the marina. I suggest that following the bailee's breach of the oral agreement and up until the time the bailee "sold" the boat for storage fees, there was never a time when the bailee could have demanded payment from the boat owner without first correcting its breach of the agreement. *See Nelson v. Hazel*, 89 Idaho 480, 406 P.2d 138 (1965).

Even assuming that the bailee had a lien for caretaker services after September 1, 1976, the lien was eliminated by an offset. The majority refuses to follow the holding of our Supreme Court in *Dawson v. Eldredge*, 89 Idaho 402, 405 P.2d 754 (1965). According to the lead opinion, *Dawson* should no longer be considered authority for the proposition that a complete offset eliminates a lien because *Dawson* relied upon a now repealed statute, former I.C. § 5–615. However, the same principle of this statute is now embodied in the language of I.R.C.P. 54(b). This rule says in part:

> If any parties to an action are entitled to judgments against each other such as on a claim and counterclaim, or upon cross-claims, such judgments shall be offset against each other and a single judgment for the difference between the entitlements shall be entered in favor of the party entitled to the larger judgment.

Here, after both sides had an opportunity to fully present their evidence, a judicial determination was made that the earned moorage fees of the bailee ($716.68) were less than the amount the bailee owed to the boat owner ($800) for equipment the bailee

had lost or appropriated. Applying *Dawson* to the facts as they existed when the bailee sold the boat to satisfy its lien, the bailee's moorage fees were completely set off and its lien was eliminated. The Rule 54(b) language quoted above supports this result.

The lead opinion chooses to abandon *Dawson* in favor of § 79 of the RESTATEMENT OF SECURITY (1941). In doing so, the majority will give this Court the distinction of being the only appellate court in the country to have relied upon § 79 in the past forty-nine years. I am not persuaded that we should narrowly focus upon two words in one unrecognized section of the RESTATEMENT to change the outcome of this case.

The majority does not like the bailee's unjustified sale of the bailor's property under I.C. § 45–805 being treated as a "conversion." Thus, the majority degrades this approach by characterizing it as the "retroactive tort" theory. Of course, the lead opinion ignores the fact that the sale was *preceded* by the bailee's conversion of the owner's equipment and by the bailee's breach of an oral agreement to return or replace the equipment within a reasonable time. Ignored also is the fact that the district judge—not the parties—"retroactively" determined that the owner should pay additional storage charges even though the bailee never performed its agreement to return or replace the equipment. I am satisfied that the district judge did this only to achieve an overall equitable result.[1]

The majority takes the position that once the foreclosure sale has occurred it is too late to rectify the injustice of taking a person's property for a debt the amount of which is less than the bailee's related debt to the owner. It is one thing to say that contemporaneous adjudication of the owner's related offset is preferred. It is quite another thing to announce that without prior adjudication of the offset no self-help sale made under I.C. § 45–805 can ever be set aside. If, instead of a self-help lien foreclosure, this had been a default judgment obtained by the bailee for $1,016.68, the owner could have filed a motion or an independent action to have the default set aside. I.R.C.P. 60(b). Essentially, that is what occurred here.

The case of *Gunnell v. Largilliere Co.*, 46 Idaho 551, 269 P. 412 (1928), is instructive. There, the holder of a chattel mortgage foreclosed by notice and sale of the property. As it was shown later, the secured note had been extended by renewal and the debt was not due when the foreclosure action was taken. Some of the mortgaged chattels had been sold when the mortgagor succeeded in stopping further proceedings. Some chattels were not returned to him. He brought a claim and delivery action against the mortgagee. He recovered a verdict for the return of the chattels or their value, compensatory damages and punitive damages.

The Supreme Court upheld all but the punitive damages. The Court said:

Where a chattel mortgage is foreclosed by notice and sale, when no legal right to do so existed because the debt was not due, a cause of action in conversion arises.... The measure of damages in such case is the value of the property at

---

1. The bailee's published notice of sale stated $1,016.68 was due for storage charges. At trial, it was shown that this amount included $150 for a Crestliner boat which had been kept at the marina until Comstock removed it sometime in 1975. All storage charges on this boat were paid by Comstock four years before the sale. The bailee's claim also included $200 for moorage of the houseboat to September 1, 1975. Comstock had paid this fee also four years before the sale. Thus, the district judge disallowed $350 of the bailee's claim. (Not only was the bailee's claim excessive, but even if Comstock had owed storage on the Crestliner boat, the bailee would have had no right to assert a lien against the houseboat for the separate storage charges on the Crestliner.)

Of the $1,016.68 claimed by the bailee, the district judge found only $666.68 to be valid. By prorating the $200 annual storage fee, he allowed another $50 for the three months in 1979 preceding the sale. Thus, the judge found that at the time of sale the bailee was entitled to a total of $716.68. The majority fails to note that even this figure includes $200 for the period from September 1, 1975 to September 1, 1976, the year the majority says the charges were to be "suspended" unless the owner's missing equipment was returned.

the time of the conversion, plus special damages caused by the taking, if specially pleaded, and interest.... The measure of damages for detention of the property is the value of its use up to the time defendant became entitled to its possession.... [Citations omitted.]

46 Idaho at 559, 269 P. at 415. The Court went on to say:

The defendant, in attempting to foreclose its mortgage, under its construction of the terms of the contract, failed to bring itself within the rules governing such procedure, and prematurely brought its foreclosure proceeding. The evidence does not show that its action was wanton, malicious or gross and outrageous, nor do the facts imply that it acted from motives of malice or oppression. The record shows that appellant was attempting to apply a remedy it deemed itself entitled to, and fails to show wilful fraud, malice or gross negligence.

46 Idaho at 560, 269 P. at 415. Thus, in *Gunnell* the Supreme Court upheld the owner's right to recover the value of his property if it could not be returned to him. Here, the bailee has not shown or even contended that the district court had the option to order the houseboat to be returned to its owner. Neither has the bailee provided us with a complete transcript of the trial and other proceedings below. Yet, in spite of these facts, the majority takes issue with "forcing" the bailee to pay the owner the fair market value of the boat as of the time of sale.

While my opinion does not reach the question of whether I.C. § 45–805 is constitutional, I will note the lack of adequate notice here. As the majority observed, the statute "simply requires that a notice of sale be published in a newspaper in the county where the property is located." The notice appeared one time in a weekly newspaper. The published notice did not clearly state where the sale was to take place. It did not name the owner of the boat to be sold. The bailee knew the owner had a Spokane, Washington address. Yet the bailee did not even mail a copy of the notice to that address, although, as the majority recognizes, the bailee knew that one letter it had sent to a representative of the owner was delivered. Because the owner's name was not given in the published notice it would be highly unlikely that anyone seeing the notice would contact the owner about the sale. Certainly, there is no reason to believe that the out-of-state owner would see the notice. As a result, the owner had no opportunity to have a representative appear at the sale. It is hardly surprising that the only persons to attend the sale were Mr. and Mrs. Gatlin, who were the owners of the Kaniksu Resort, and their attorney. Of course, the only bid received was from Mr. Gatlin in the amount of his claim.

The district court recognized that while the owner was not without fault in protecting his rights, the owner was not deprived of a remedy. The court's decision was based on sound legal precedent and reached an equitable result. I would affirm.